(No. 75902.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ALTON COLEMAN, Appellant.

*Opinion filed November 2, 1995.—Rehearing denied January 29, 1996.*

514

516

Mary Elizabeth Kopko, of Chicago, and Robert Davidow, of Arlington, Virginia, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Michael J. Waller, State's Attorney, of Waukegan (Rosalyn B. Kaplan, Solicitor General, and Arleen C.

Anderson and Steven J. Zick, Assistant Attorneys General, of Chicago, and Matthew Chancey and Joy C. Silzer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

Following a jury trial in the circuit court of Lake County, defendant, Alton Coleman, was found guilty of aggravated kidnapping (Ill. Rev. Stat. 1983, ch. 38, par. 10—2) and murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1) in connection with the abduction and death of nine-year-old Vernita Wheat. The jury found defendant eligible for the death penalty (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(b)(3), (b)(7)) and found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The trial court sentenced defendant to death and to a 15-year term of imprisonment for aggravated kidnapping. On direct appeal to this court, defendant's convictions and sentence were affirmed. (*People v. Coleman* (1989), 129 Ill. 2d 321, *cert. denied* (1990), 497 U.S. 1032, 111 L. Ed. 2d 802, 110 S. Ct. 3294.) Defendant subsequently filed a petition for relief under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1991, ch. 38, par. 122—1 *et seq.*) in the circuit court of Lake County. The circuit court dismissed the majority of the claims in defendant's petition without an evidentiary hearing. Following an evidentiary hearing, the circuit court denied relief on the remaining claims. Defendant appeals directly to this court pursuant to Supreme Court Rule 651 (145 Ill. 2d R. 651). For the reasons set forth below, we affirm.

BACKGROUND

The factual background of the trial and sentencing is set forth in this court's opinion in defendant's direct appeal (*People v. Coleman* (1989), 129 Ill. 2d 321), and

only a relatively brief summary is necessary here. We note that although defendant was initially represented by Lake County Public Defender Michael Melius and Assistant Public Defender Joan Pantsios, six days before trial defendant requested to waive the right to counsel and act as his own attorney. The trial court granted defendant's request, and appointed attorneys Melius and Pantsios to act as advisors to defendant during trial.

The following evidence was presented at trial. On June 19, 1984, the body of the victim, Vernita Wheat, was discovered in a bathroom in an abandoned apartment building in Waukegan. Her hands were bound, and a cable was wrapped around her chest and neck. Dr. Larry Blum performed an autopsy and determined that the cause of death was ligature strangulation and that the victim had died about three weeks before the discovery of the body. A forensic entomologist studied the development of fly larvae on the body and concluded that the body had probably been placed in the building on May 29 or May 30. Two fingerprints were found side by side on the lower portion of the door to the bathroom where the body was found. One of the fingerprints matched defendant's, and the other was unidentified.

Juanita Wheat, the victim's mother, testified that at the time of the offense she lived in Kenosha, Wisconsin, with her children, Vernita and seven-year-old Brandon. Juanita met defendant in late April or early May 1984, and knew him by the name Robert Knight. Defendant had told Juanita that he lived in her neighborhood in Kenosha, although in actuality he lived in Waukegan. He also falsely claimed that he was employed by American Motors. Juanita last saw Vernita alive on May 29, 1984. That evening, defendant stated that he wanted to give Juanita a stereo as a gift. At about 10:15 p.m., with Juanita's permission, Vernita accompanied defendant to pick up the stereo at defendant's apartment. Juanita

did not give defendant permission to take Vernita to Waukegan. Defendant failed to return with Vernita, and Juanita contacted the police.

Defendant and the victim were observed entering an establishment in Kenosha known as the "400 Club" at about 11:35 p.m. on May 29. Upon arrival at the 400 Club, defendant used the telephone, and a short time later a cab arrived to pick up defendant and Vernita. One of the patrons of the 400 Club testified that the cab driver's name was Keith. Cab driver Keith Hach testified that at 11:35 p.m. on May 29 he was dispatched to the 400 Club where he picked up a black man and a black girl. Defendant is black, as was Vernita. The man first directed Hach to drive to a location in Zion, Illinois. When they arrived, the man asked Hach to drive to Waukegan. Hach dropped the man and girl off near Slater's Barbeque in Waukegan. James Adams was working in the area near Slater's Barbeque in the early morning hours of May 30. At about 1:30 a.m., he observed a black man wearing a large floppy hat walking with a young girl near Slater's Barbeque. Slater's Barbeque is located about two blocks from the building where Vernita's body was discovered.

On May 31, 1984, a Waukegan police officer observed defendant near defendant's sister's house. When the officer activated his squad car's lights, defendant fled. The State also presented evidence that subsequent to Vernita Wheat's disappearance, defendant attempted to obtain false identification cards and defendant left the State.

Anna Ross, an acquaintance of the Wheats, testified on defendant's behalf that on the afternoon of May 30, 1984, she saw Vernita and defendant walking together in front of her house in Kenosha. Ross waved to Vernita and Vernita waved back.

The jury was instructed on theories of intentional

murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(1)), murder based on knowledge of a strong probability of death or great bodily harm (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(2)) and felony murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(3)) based on aggravated kidnapping. The jury returned general verdicts of guilty of aggravated kidnapping and murder.

Thereafter, a bifurcated death penalty hearing was conducted before the jury that had found defendant guilty. At defendant's request, attorneys Melius and Pantsios were reappointed to represent him at sentencing. At the first stage of sentencing, the jury found that defendant was at least 18 years of age at the time of the murder and was eligible for the death penalty on the basis that he had been convicted of intentional murder in Indiana and Ohio, under laws substantially similar to the laws of the State of Illinois (Ill. Rev. Stat. 1983, ch. 38, 9—1(b)(3)). The record reveals that the Indiana and Ohio murders occurred after the murder of Vernita Wheat, but defendant was tried for those murders first. The jury also found defendant eligible for the death penalty because the victim was under 12 years of age and death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(7).) The State also sought to impose the death penalty on the basis that defendant personally killed the victim and acted knowingly or intentionally. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(6)(b).) However, the jury could not reach a verdict finding defendant eligible for the death penalty on this basis.

After the jury found defendant eligible for the death penalty, defendant again requested to act *pro se*. The trial court granted the request and attorneys Melius and Pantsios were again appointed to act as advisors. At the second stage of the sentencing proceedings, the State introduced evidence that in June and July of 1984, de-

fendant participated in the murders of seven-year-old Tamika Turks and Eugene Scott, whose bodies were discovered in Indiana; 15-year-old Tonnie Storey, Marlene Walters and Virginia Temple and her nine-year-old daughter, Rachelle, whose bodies were discovered in Ohio; and Donna Williams, whose body was discovered in Michigan. At the time of trial in the instant case, defendant had already been found guilty of the murders of Tamika Turks, Marlene Walters and Tonnie Storey. The State also presented evidence of defendant's involvement in other offenses during this time period, including attempted murder, sexual assault, robbery and kidnapping.

As evidence in mitigation, defendant presented the testimony of Reverend Lloyd R. Davis, pastor of the Christian Fellowship Church in Waukegan, who had counselled defendant. According to Reverend Davis, defendant sought spiritual guidance and indicated his desire to find peace with God.

The jury unanimously found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty, and the trial court sentenced defendant to death. As noted above, this court affirmed the conviction and sentence. On May 31, 1991, defendant filed a petition under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1991, ch. 38, par. 122—1 *et seq.*). The circuit court dismissed all of the claims in defendant's petition, as amended, except a portion of defendant's claim of ineffective assistance of counsel relating to trial counsel's performance during the first stage of sentencing (eligibility), and his claim that his waiver of counsel at trial and at the second stage of sentencing (aggravation/mitigation) was invalid. Following an evidentiary hearing, the circuit court denied those claims. This appeal followed.

## ANALYSIS

### I

At the outset, we note that the circuit court ruled that numerous claims in defendant's post-conviction petition were waived because they could have been raised in defendant's direct appeal. A proceeding under the Post-Conviction Hearing Act does not constitute an appeal. Rather, the Act permits a defendant to mount a collateral attack on his conviction and sentence based on violations of his constitutional rights. (*People v. Mahaffey* (1995), 165 Ill. 2d 445, 452; *People v. Thompkins* (1994), 161 Ill. 2d 148, 157.) It is well established that the scope of post-conviction review is limited to constitutional matters which have not been, and could not have been, previously adjudicated. (*People v. Brisbon* (1995), 164 Ill. 2d 236, 245; *People v. Winsett* (1992), 153 Ill. 2d 335, 346.) Accordingly, determinations of the reviewing court on direct appeal are *res judicata* as to issues actually decided and issues that could have been raised on direct appeal but were not are waived. (*Mahaffey*, 165 Ill. 2d at 452; *People v. Thomas* (1995), 164 Ill. 2d 410, 416; *People v. Flores* (1992), 153 Ill. 2d 264, 274; *People v. Collins* (1992), 153 Ill. 2d 130, 135.) Occasionally, these procedural bars may be relaxed when fundamental fairness requires. *Thompkins*, 161 Ill. 2d at 158.

It is true that numerous claims in defendant's post-conviction petition involve matters documented in the trial record which could have been raised on direct appeal. Nevertheless, in his post-conviction petition, defendant alleges that appellate counsel's failure to raise these issues on direct appeal constitutes ineffective assistance of counsel. A defendant is guaranteed the effective assistance of counsel on appeal. (*Evitts v. Lucey* (1985), 469 U.S. 387, 393-97, 83 L. Ed. 2d 821, 828-30, 105 S. Ct. 830, 834-37; *Flores*, 153 Ill. 2d at 277.) This court has held that the doctrine of waiver should not

bar consideration of an issue where the alleged waiver stems from incompetency of counsel on appeal. (*People v. Salazar* (1994), 162 Ill. 2d 513, 520-21; *Winsett*, 153 Ill. 2d at 346; *Flores*, 153 Ill. 2d at 282; *People v. Ruiz* (1989), 132 Ill. 2d 1, 10; see *People v. Brisbon* (1995), 164 Ill. 2d 236, 255.) Claims of ineffective assistance of appellate counsel are evaluated under the standard set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, which requires the defendant to show *both* deficient performance by counsel and resultant prejudice. We note that appellate counsel "has no obligation to raise every conceivable argument which might be made, and counsel's assessment of what to raise and argue will not be questioned unless it can be said that his judgment in this regard was patently erroneous." *Collins*, 153 Ill. 2d at 140.

Accordingly, we will examine the merits of the issues which could have been raised on direct appeal as they relate to defendant's allegations of ineffective assistance of counsel on appeal. We note that unless the underlying issues are meritorious, defendant obviously suffered no prejudice due to appellate counsel's failure to raise them on direct appeal. See *Winsett*, 153 Ill. 2d at 347.

## II

Turning to the merits of defendant's post-conviction claims, we first address those claims which the circuit court denied following an evidentiary hearing.

### A. Competence to Waive Counsel

Defendant contends that the circuit court in the post-conviction proceedings erred in concluding that he was competent to waive counsel during trial and the second stage of sentencing. A criminal defendant may not waive his right to counsel unless he does so " 'competently and intelligently.' " (*Godinez v. Moran* (1993),

524

509 U.S. 389, 396, 125 L. Ed. 2d 321, 330, 113 S. Ct. 2680, 2685, quoting *Johnson v. Zerbst* (1938), 304 U.S. 458, 468, 82 L. Ed. 1461, 1469, 58 S. Ct. 1019, 1025.) Competence to waive counsel is measured by the same standard as competence to stand trial. (*People v. Mahaffey* (1995), 166 Ill. 2d 1, 19, citing *Godinez*, 509 U.S. at 396, 125 L. Ed. 2d at 330, 113 S. Ct. at 2685.) A defendant is considered unfit to stand trial if, because of a mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. (*People v. Eddmonds* (1991), 143 Ill. 2d 501, 512.) Fitness speaks only to a person's ability to function within the context of trial; it does not refer to sanity or competence in other areas. (See *People v. Fowler* (1991), 222 Ill. App. 3d 157, 164.) A person can be fit for trial although his mind may be otherwise unsound. See *Fowler*, 222 Ill. App. 3d at 164.

At the post-conviction evidentiary hearing, defendant's trial attorneys and an attorney who represented defendant in a Federal kidnapping prosecution testified that defendant was extremely distrustful, uncooperative and difficult to work with. Defendant also presented the testimony of Dr. Leonard D. Elkun, a physician specializing in forensic psychiatry. Dr. Elkun personally interviewed defendant and reviewed reports from other mental health professionals concerning defendant's mental and emotional health and various materials relating to legal proceedings and defendant's personal background. Dr. Elkun formed the opinion that at the time defendant waived counsel, he was suffering from borderline personality disorder, a serious mental illness characterized by a poor capacity to organize one's life and plan for the future, the elevation of personal motivations above societal values, unstable interpersonal relationships, and instability in mood. According to Dr. Elkun, individuals suffering from borderline

personality disorder experience transient psychotic episodes, but may otherwise appear outwardly normal. Dr. Elkun testified that defendant's grandmother, allegedly a practitioner of voodoo, instilled in defendant the belief that he possessed supernatural powers and was exempt from the laws of society. Dr. Elkun believed defendant's condition caused him to overestimate his ability to conduct his own defense. According to Dr. Elkun, defendant's paranoid thinking, characterized by mistrust of his attorneys, combined with his delusions of grandeur, prevented defendant from being able to make a knowing and intelligent decision whether to waive counsel.

Defendant contends that in view of Dr. Elkun's testimony, the circuit court erred in denying post-conviction relief. We disagree. Mindful that determinations by the trial court in post-conviction proceedings will not be disturbed on review unless contrary to the manifest weight of the evidence (*People v. Eddmonds* (1991), 143 Ill. 2d 501, 514), we note that the ultimate issue of fitness is for the trial court, not the experts, to decide (see *People v. Bleitner* (1989), 189 Ill. App. 3d 971, 976). The mere fact that a psychiatrist expresses the opinion that the defendant was unfit does not require a similar finding by the trial court; it is the trial court's function to assess the credibility and weight to be given to psychiatric expert testimony. See *Bleitner*, 189 Ill. App. 3d at 976.

The circuit court indicated that in light of all the evidence presented, it did not find Dr. Elkun's testimony to be credible. In this regard we note that the circuit court had the opportunity to observe Dr. Elkun's demeanor on the witness stand, including his demeanor during the State's sometimes vigorous cross-examination. In addition to Dr. Elkun's testimony, the trial court heard testimony from mental health profes-

sionals who had examined defendant in 1984 and found him fit to stand trial on criminal charges in another jurisdiction. Other evidence before the circuit court included the observations of defendant's demeanor and behavior by his trial attorneys and others who had frequent contact with him prior to and during his trial. While these witnesses lacked formal training in psychiatry or psychology, nonexperts who have had an opportunity to observe a person may give their opinions of mental condition or capacity based on their observations, and such lay opinions may overcome an expert opinion. (See *Bleitner*, 189 Ill. App. 3d at 976.) Moreover, in assessing defendant's fitness the circuit court could properly consider defendant's conduct at trial, as reflected in the trial transcripts. Defendant's conduct at trial clearly demonstrates that he understood the nature and purpose of the proceedings against him.

Dr. Elkun's testimony that defendant suffered paranoid thought processes might suggest an inability to assist counsel in his defense. However, there was testimony that while acting *pro se* defendant was sometimes agreeable to the recommendations of the attorneys acting as his advisors. From this evidence it is possible to infer that defendant's distrustfulness was not so pervasive as to constitute paranoia. While Dr. Elkun offered the opinion that defendant's decision to conduct his own defense was symptomatic of paranoid thinking, the trial court could conclude that the decision may have been in part a response to the fact that in three prior capital cases in other jurisdictions, his attorneys had been unable to save him from the death penalty. In view of all the circumstances, the circuit court's determination that defendant's waiver of counsel was valid is not against the manifest weight of the evidence.

B. Ineffective Assistance of Counsel During the Eligibility Phase of the Sentencing Proceedings

Defendant contends that he was deprived of effective assistance of counsel during the first stage of the sentencing proceedings. According to defendant, his attorneys should have asserted a defense to imposition of the death penalty based on the eighth amendment proportionality principles set forth in *Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368, and *Tison v. Arizona* (1987), 481 U.S. 137, 95 L. Ed. 2d 127, 107 S. Ct. 1676. In *Enmund,* the Court concluded that the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) precludes capital punishment for an offender "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Enmund,* 458 U.S. at 797, 73 L. Ed. 2d at 1151, 102 S. Ct. at 3376.) Subsequently, in *Tison,* which was decided shortly after the sentencing proceedings in the case at bar, the Court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Tison,* 481 U.S. at 158, 95 L. Ed. 2d at 145, 107 S. Ct. at 1688.

Defendant maintains that certain physical and testimonial evidence presented at trial suggests that even to the extent he was involved in the murder of Vernita Wheat, he did not act alone. Defendant asserts that the evidence provides no basis for a rational conclusion as to the respective roles and mental states of the participants, and accordingly it cannot be established that he acted with the degree of personal culpability necessary to permit imposition of the death penalty. At the post-conviction evidentiary hearing, defendant presented the testimony of Robert Isaacson, a defense attorney with extensive experience in capital cases. Isaac-

son testified that defendant's attorneys should have sought a ruling from the trial court that defendant was ineligible for the death penalty as a matter of law. According to Isaacson, if the trial court declined to rule that defendant was ineligible for the death penalty, defendant's attorneys should have requested that the jury be instructed in accordance with *Enmund* and should have offered argument on the question. Defendant contends that trial counsel's failure to take these steps constituted ineffective assistance of counsel. We disagree.

As noted, claims of ineffective assistance of counsel based on deficient representation of a criminal defendant are evaluated in accordance with the two-prong test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. *Strickland* provides as follows:

> "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.)

Where it is possible to resolve an ineffective-assistance claim on the basis that the defendant suffered no prejudice as a result of counsel's allegedly defective performance, the claim may be decided against the defendant without consideration of whether counsel's performance was actually deficient. *Strickland*, 466 U.S. at 697, 80 L.

Ed. 2d at 699, 104 S. Ct. at 2070; see also *Mahaffey*, 165 Ill. 2d at 457-58.

Having carefully reviewed the trial record, we conclude that the omissions by trial counsel upon which defendant bases his ineffective-assistance claim did not result in prejudice within the meaning of *Strickland*. *Enmund* and *Tison* place limits on when the death penalty may be imposed on a person who aids and abets a felony during the course of which a murder is committed *by others*. Neither decision limits the imposition of capital punishment upon an offender who personally performs the acts causing death. (See *Mann v. Dugger* (11th Cir. 1987), 817 F.2d 1471, 1478, *vacated on other grounds on reh'g* (11th Cir. 1987), 828 F.2d 1498; *State v. Atwood* (1992), 171 Ariz. 576, 650, 832 P.2d 593, 667; *People v. Hayes* (1990), 52 Cal. 3d 577, 632, 802 P.2d 376, 410, 276 Cal. Rptr. 874, 908; *State v. Fields* (Idaho 1995), 908 P.2d 1211.) In finding defendant guilty of murder under the instructions given in this case, the jury necessarily determined beyond a reasonable doubt that defendant himself killed the victim. As the State correctly points out, the jury was not instructed on the principles of accountability. All of the murder instructions required the jury to find that defendant performed the acts causing Vernita Wheat's death in order to return a guilty verdict.

We note that "*Enmund* does not impose *any* particular form of procedure upon the States." (Emphasis in original.) (*Cabana v. Bullock* (1986), 474 U.S. 376, 386, 88 L. Ed. 2d 704, 716, 106 S. Ct. 689, 697.) What is required is that "the State's judicial process leading to the imposition of the death penalty must at *some* point provide for [the requisite findings]." (Emphasis in original.) (*Bullock*, 474 U.S. at 390-91, 88 L. Ed. 2d at 719, 106 S. Ct. at 699.) Accordingly, the jury's guilt phase

verdict will satisfy *Enmund* when the verdict necessarily establishes either: (1) that the defendant personally killed the victim or (2) that the defendant acted with the requisite culpable mental state in cases where an accomplice may have killed the victim. (See *Andrews v. Shulsen* (10th Cir. 1986), 802 F.2d 1256, 1272 ("A death sentence may rest upon a guilty verdict which necessitates a finding of intent"); *Wingo v. Blackburn* (5th Cir. 1986), 783 F.2d 1046, 1050 (where jury was instructed that it could not find the defendant guilty of first degree murder unless he was proved to have intended to kill, *Enmund* did not impose a constitutional requirement that the instruction on specific intent be repeated at the sentencing stage); *State v. Atwood* (1992), 171 Ariz. 576, 650, 832 P.2d 593, 667 (jury's finding that defendant actually killed victim implicit in its verdict of guilty of first degree felony murder was sufficient under *Enmund*); *State v. Fields* (Idaho 1995), 908 P.2d 1211 (where the jury found at the guilt phase that the defendant actually killed his victim, *Enmund* was inapposite); *Mann v. State* (Okla. 1988), 749 P.2d 1151, 1161 ("To apply the *Enmund* criteria and its progeny in a malice aforethought murder at the *sentencing* stage, would be the equivalent of asking the jury to re-examine their finding of guilt" (emphasis in original)); *Webb v. State* (Tex. Crim. App. 1988), 760 S.W.2d 263, 269 (where jury was required to find an intent to promote or assist commission of an intentional murder before it could convict defendant as a party to the offense in the first instance, jury's later punishment verdict was not fatally defective).) Because the jury determined at the guilt phase that defendant himself killed the victim, defendant was not entitled to have the question revisited at the sentencing phase, and defense counsel's failure to submit instructions and offer argument on *Enmund*

caused no prejudice under the *Strickland* test. Since from a procedural standpoint there was no right to have the jury pass upon the issue at sentencing, we need not speculate as to what the jury would have found had the issue been before it. Similarly, assuming the evidence supports the jury's determination, a motion to bar imposition of the death penalty would have been properly denied, and defense counsel's failure to make such a motion was not prejudicial under *Strickland*.

Defendant maintains, however, that the evidence at trial suggests the involvement of another individual who may have been the actual killer. Defendant notes James Adams' testimony that he observed a black male wearing a large hat walking with a young girl near the building where the victim's body was discovered. Defendant points out that there was no testimony that he was wearing a hat during the relevant time frame. Defendant also contends that pubic hairs not belonging to him were present at the victim's autopsy. Lastly, defendant notes the unidentified fingerprint found next to his own on the door to the bathroom where the victim's body was discovered.

We are not persuaded that this evidence raises a reasonable doubt as to whether defendant performed the acts causing Vernita Wheat's death. First, that the individual observed by James Adams wore a hat does not mean that that individual was someone other than defendant. Even if defendant was not seen wearing a hat at other points in time, he might have worn one at the time Adams made his observation. Defendant's reliance on pubic hairs which he claims were present at the victim's autopsy is similarly unpersuasive. Defendant's argument is somewhat misleading inasmuch as he neglects to mention conflicting evidence regarding the origin of the pubic hairs and other testimony casting doubt on whether the hairs belonged to a participant in

the crimes. Dr. Larry Blum performed the autopsy with the assistance of James Murray, a deputy coroner for Lake County. Murray testified that he observed Dr. Blum "pull" hairs from the pubic area of the victim. On the other hand, Dr. Blum testified that he did not recall taking any pubic hairs from the victim and did not discover any loose hairs in the pubic area of the victim. Dr. Blum also testified that he found no signs of sexual abuse. Chester Blythe, a special agent with the Federal Bureau of Investigation, compared the pubic hairs to specimens obtained from defendant and concluded they did not match. However, Special Agent Blythe also testified that the hairs appeared to have been forcibly removed. Moreover, he noted the presence of tissue on the hairs, which was consistent with hairs obtained from a decomposing body. Given the somewhat conflicting testimony of Dr. Blum and Murray, and Agent Blythe's testimony suggesting that the hairs may have been plucked from a decomposing body, the jury need not have viewed the pubic hairs as establishing the involvement of an accomplice.

Finally, although the unidentified fingerprint near defendant's own fingerprint might theoretically have been left by an accomplice, it might also have been left by someone unconnected to the crime, and its proximity to defendant's fingerprint could rationally be attributed to coincidence. We are aware that in rebuttal to defendant's closing argument the State asserted that the unidentified fingerprint belonged to an unknown party to the crime. Nonetheless, the State's argument was not binding on the jury. As noted above, the jury was not instructed on principles of accountability, and thus to convict defendant of murder under any of the theories presented, it had to conclude beyond a reasonable doubt that defendant was the actual killer. The question before us is whether the evidence supports this

determination. We conclude that it does. Where circumstantial evidence relied upon to support the defense that another committed the crime is unsatisfactory, based upon mere surmise or possibility, without evidence to support it, a hypothesis of innocence may be rejected by the trier of fact. (*People v. Hendricks* (1986), 145 Ill. App. 3d 71, 102, *rev'd on other grounds* (1990), 137 Ill. 2d 31.) In the case at bar, the jury was under no obligation to speculate that the victim may have been killed by a hypothetical accomplice.

Even if we were to adopt defendant's theory that Vernita Wheat may have been killed by an accomplice, we would still conclude that trial counsel's inaction was not prejudicial. Under *Tison*, when a murder occurs during the course of another felony, major participation in the felony combined with reckless indifference to human life satisfies the eighth amendment's standard of personal culpability required for imposition of capital punishment. Although *Tison* was decided after the sentencing proceedings in the case at bar, defendant must demonstrate prejudice with reference to the *Tison* standard even though the existing standard under *Enmund* alone may arguably have been more favorable to defendant. See *Lockhart v. Fretwell* (1993), 506 U.S. 364, 122 L. Ed. 2d 180, 113 S. Ct. 838 (although objection to death penalty eligibility might have been successful based on existing precedent at time of death penalty hearing, *habeas corpus* petitioner could not rely on that precedent, which had since been overruled, to demonstrate that trial counsel's failure to make the objection was prejudicial).

Even assuming, *arguendo*, that defendant may have had an accomplice who actually killed the victim, defendant was clearly a major participant in the underlying felony of aggravated kidnapping. Additionally, although the State's case depended upon circumstantial evidence

which does not elucidate all the details of the victim's death, when the evidence is viewed in its entirety, the conclusion that defendant acted at least with reckless indifference to the victim's life is practically inescapable. The evidence clearly establishes that defendant kidnapped the young victim and that defendant was present at the location where the victim's body was discovered with her hands and chest bound and a cable wrapped around her neck. Given this evidence, it strains credulity to postulate that defendant might have acted with a mental state less culpable than reckless indifference to human life. We conclude both that the evidence was sufficient to establish beyond a reasonable doubt the requisite culpability under *Tison*, and that no reasonable probability exists that the jury would have found otherwise if the question had been submitted to it.

## III

We next consider those post-conviction claims which the circuit court dismissed without an evidentiary hearing.

### A. Ineffective Assistance of Counsel Prior to Trial

#### i. *Failure to Investigate Mitigating Evidence*

Defendant contends that his attorneys' performance prior to trial was deficient because they failed to conduct any meaningful investigation into his personal background and mental or emotional condition for purposes of developing mitigating evidence for use during the penalty phase of the proceedings. Defendant claims that an adequate investigation would have yielded evidence of his severe mental or emotional problems and that he experienced an extremely troubled childhood. According to defendant, had this evidence been available at the second stage of sentencing (aggravation/mitigation), there is a reasonable probability that the jury would

have spared him from the death penalty. The circuit court dismissed this claim without an evidentiary hearing, concluding that the omitted evidence would not have changed the outcome of sentencing.

Defendant's post-conviction petition includes affidavits from family members and acquaintances, and affidavits from several mental health professionals discussing defendant's personal background and offering opinions regarding defendant's mental or emotional condition. According to these affidavits, defendant was raised in a highly unstable, abusive and sexually inappropriate environment. The affidavits from mental health professionals variously indicated, *inter alia*: (1) a probable diagnosis of borderline personality disorder (which sometimes involves psychotic episodes when the sufferer is subjected to extreme stress); (2) that defendant suffered from a severe personality disorder with borderline, paranoid and antisocial elements; (3) that defendant was probably suffering from manic-depressive psychosis at the time of the offenses; and (4) that there were strong indications that defendant's aberrant behavior and personality disorder were linked, in part, to attentional deficit hyperactivity disorder and associated emotional stress during childhood and adulthood.

Where an adequate investigation has been conducted, the failure to present mitigating evidence does not itself establish that defense counsel was ineffective. (See *Burger v. Kemp* (1987), 483 U.S. 776, 97 L. Ed. 2d 638, 107 S. Ct. 3114; *People v. Perez* (1992), 148 Ill. 2d 168, 186.) An informed decision not to present certain mitigating evidence may represent a valid strategic choice, particularly where the evidence is potentially damaging. However, where counsel has neglected to conduct a proper investigation into mitigating circumstances, the failure to introduce mitigating evidence cannot be attributed to strategy. (*Perez*, 148 Ill. 2d at

190; see also *Baxter v. Thomas* (11th Cir. 1995), 45 F.3d 1501, 1514, quoting *Horton v. Zant* (11th Cir. 1991), 941 F.2d 1449, 1462 (" '[O]ur case law rejects the notion that a "strategic" decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them' ").) In such cases, counsel's performance falls below objective standards of reasonableness.

Even where counsel's performance is deficient due to the failure to investigate mitigating circumstances, the defendant must still demonstrate prejudice to sustain a claim of ineffective assistance of counsel. In evaluating prejudice in a capital sentencing context, "the question is whether there is a reasonable probability that, absent the errors, the factfinder *** would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." (*Strickland v. Washington* (1984), 466 U.S. 668, 695, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068-69.) In making this determination, a court must consider the totality of the evidence, and "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695-96, 80 L. Ed. 2d at 698-99, 104 S. Ct. at 2069.

This case differs from the typical "failure to investigate" case in that, although defendant was represented by counsel for a period prior to trial, he invoked the right to self-representation at the aggravation/mitigation stage of sentencing. The State argues that because defendant proceeded without counsel at the aggravation/mitigation stage, he may not pursue an ineffective-assistance claim relating to the outcome of that portion of the proceedings. (But see *Hance v. Kemp* (1988), 258 Ga. 649, 650, 373 S.E.2d 184, 186 (although defendant was permitted to act as "co-counsel" at

sentencing, defendant could pursue an ineffective-assistance claim based on counsel's alleged failure properly to investigate, prepare and present evidence of his mental condition and family background where it appeared that the defendant's claim of ineffectiveness related primarily to the performance of his attorney before defendant sought to act as co-counsel).) We need not address this argument. Even if defendant's waiver of counsel does not foreclose the present claim, we conclude that the circuit court committed no error in dismissing the claim without an evidentiary hearing on the basis that trial counsel's alleged failure to investigate was not prejudicial.

A defendant is entitled to an evidentiary hearing on a post-conviction claim only if he has made a substantial showing, based on the record and supporting affidavits, that his constitutional rights were violated. (*People v. Guest* (1995), 166 Ill. 2d 381, 389; *People v. Gaines* (1984), 105 Ill. 2d 79, 91-92.) The trial court's determination will not be disturbed unless manifestly erroneous. (*Guest*, 166 Ill. 2d at 389; *People v. Griffin* (1985), 109 Ill. 2d 293, 303.) We acknowledge the critical importance to the sentencing decision of evidence of capital defendant's background and any mental or emotional problems that afflict him. (See, *e.g.*, *Baxter v. Thomas* (11th Cir. 1995), 45 F.3d 1501, 1515, quoting *Middleton v. Dugger* (11th Cir. 1988), 849 F.2d 491, 495 ("Psychiatric mitigating evidence 'has the potential to totally change the evidentiary picture' ").) At the same time, not every mental or emotional condition that can be classified as a "disorder" will necessarily be mitigating, and in the case at bar it is not clear that expert testimony would have produced a profile that the jury would have viewed in an entirely sympathetic light. For instance, the affidavit of clinical psychologist Nancy Schmidtgoessling, Ph.D., submitted in support of the post-conviction petition, indicates that

defendant had developed personality characteristics likely to be viewed as aggravating rather than mitigating, namely a lack of empathy and lack of guilt or anxiety attached to illegal or antisocial behaviors.

Moreover, we must assess prejudice in a realistic manner based on the totality of the evidence. Accordingly, it is improper to focus solely on the potential mitigating evidence. As our cases illustrate, the nature and extent of the evidence in aggravation must also be considered. See *People v. Thomas* (1995), 164 Ill. 2d 410, 427-29; *People v. Caballero* (1992), 152 Ill. 2d 347, 365-67; *People v. Eddmonds* (1991), 143 Ill. 2d 501, 534-36; see also *Stafford v. Saffle* (10th Cir. 1994), 34 F.3d 1557, 1564 ("In deciding whether Stafford was prejudiced, we must keep in mind the strength of the government's case and the aggravating factors the jury found as well as the mitigating factors that might have been presented if Stafford had been provided effective assistance of counsel"); *Schlup v. Armontrout* (8th Cir. 1991), 941 F.2d 631, 639 (in light of numerous aggravating circumstances, expert psychiatric or psychological testimony would not with "reasonable probability" have been likely to change the defendant's sentence); *Campbell v. Kincheloe* (9th Cir. 1987), 829 F.2d 1453, 1464 (even if evidence of defendant's background, childhood, family relationships, child abuse, upbringing and drug abuse could have been presented without opening the door for damaging rebuttal evidence by the prosecution, given the overwhelming aggravating factors and the heinous nature of the crime there was no reasonable likelihood the jury's verdict would have been different had the mitigating evidence been introduced); *Squires v. Dugger* (M.D. Fla. 1992), 794 F. Supp. 1568, 1577 (evidence of the defendant's unfortunate childhood did not outweigh aggravating factors, and no prejudice resulted from counsel's failure to present mitigating evidence of the defendant's troubled childhood).

In light of the overwhelming aggravating circumstances, the introduction of potentially mitigating evidence of defendant's background and mental and emotional health would not have been sufficient to change the jury's sentencing decision. The crime in the case at bar was a horrifying and despicable attack on a defenseless child accomplished by deception of the child's mother. Moreover, the jury heard evidence that in the weeks following the murder of Vernita Wheat, defendant engaged in a brutal interstate crime spree, murdering or terrorizing numerous children and adults. Given the aggravating circumstances in the case at bar and the nature of the proposed mitigating evidence, the only realistic conclusion to be drawn is that there is no reasonable probability that the proposed mitigating evidence would have persuaded the jury that the balance of aggravating and mitigating factors did not warrant the death penalty.

Defendant relies principally on *People v. Perez* (1992), 148 Ill. 2d 168, where this court ordered a new sentencing hearing based on counsel's failure to properly investigate and present mitigating evidence. In *Perez*, a diligent investigation would have revealed, *inter alia*, that during childhood the defendant had been abandoned by his family and that the defendant's IQ placed him in a category between "low average (dull)" and "mentally deficient." This court concluded that, under the circumstances of the case, there was a reasonable probability that had the jury known of the mitigating evidence which counsel failed to investigate, the jury would not have found that the death penalty was warranted.

In the case at bar, defendant's conduct in defending himself at trial suggests that he is of at least an average intellectual capacity, while the evidence of his crimes establishes him as a cunning predator. The quantum of

aggravating evidence here also clearly distinguishes this case from *Perez*. In *Perez*, the defendant, an inmate of the Illinois correctional system, was eligible for the death penalty for murdering a fellow inmate (see Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(2)). Other aggravating circumstances consisted of the defendant's prior convictions for armed robbery and purse snatching, the fact that the defendant had held a scissors blade to the neck of a victim of an armed robbery and defendant's disciplinary violations in prison. (See *People v. Perez* (1985), 108 Ill. 2d 70.) Because the aggravating circumstances in *Perez* were in no way comparable to the circumstances of the case at bar, defendant's reliance on *Perez* is misplaced. (See also *People v. Thomas* (1995), 164 Ill. 2d 410, 430.) The circuit court did not err in dismissing defendant's claim without an evidentiary hearing.

### ii. *Failure to Move for Substitution of Judge*

Defendant contends that trial counsel's failure to move for a substitution of judge at trial represents ineffective assistance of counsel. Apparently, at the time of the commission of the offense in the case at bar, defendant was free on bond with sex offense charges pending against him. The trial judge in the case at bar was also the judge who admitted defendant to bail. A local newspaper editorial was critical of the fact that defendant was free on bond at the time of the offense. While defendant cites no authority involving similar facts, he insists that under these circumstances trial counsel's failure to move for substitution of judges deprived him of an impartial tribunal. We disagree.

This court has noted that outside of situations where a judge's pecuniary interest in a case requires disqualification, "[a]nother guiding principle on the issue of judicial bias is whether the case involves a possible temptation such that the average person, acting as

judge, could not hold the balance nice, clear and true between the State and the accused." (*People v. Del Vecchio* (1989), 129 Ill. 2d 265, 275, citing *Tumey v. Ohio* (1926), 273 U.S. 510, 532, 71 L. Ed. 749, 758, 47 S. Ct. 437, 444.) In *Del Vecchio*, this court further observed that only under the most extreme cases would disqualification for bias or prejudice be constitutionally required. (*Del Vecchio*, 129 Ill. 2d at 275, citing *Aetna Life Insurance Co. v. Lavoie* (1986), 475 U.S. 813, 821, 89 L. Ed. 2d 823, 832, 106 S. Ct. 1580, 1585.) No doubt any judge would be distressed to learn that an individual admitted to bail by that judge had thereafter been accused of committing a violent crime. But to conclude from this alone that the judge could not set aside personal feelings and act in an impartial manner would give too little credit to the temperament and integrity of members of the bench.

The additional element of media attention to defendant's freedom on bail at the time of the offense does not alter our conclusion. The mere fact that a judge has been subjected to press criticism in connection with a case or a party does not necessarily require the judge's disqualification. In one court's words, "[b]y training and inclination, judges meet media criticism of their actions with robust insensitivity." (*United States v. Martorano* (3d Cir. 1989), 866 F.2d 62, 69 (although the press had criticized the trial judge for acting as a character witness for defendant's attorney in other proceedings, court rejected argument that the trial judge dealt harshly with defendant to refute the implication of favoritism towards defendant's attorney).) In any event, the editorial in the case at bar posed no significant danger of judicial bias. While the editorial mentioned that defendant was free on bond at the time of Vernita Wheat's murder, its overall theme was that the criminal justice system as a whole had failed. The criticism was not

levelled against the trial judge personally, and the editorial did not fault the trial judge personally for defendant's release on bond. Indeed, the trial judge is not even identified by name. Trial counsel's failure to move for a substitution of judges did not deprive defendant of an impartial tribunal or otherwise engender prejudice.

### iii. *Per se Sixth Amendment Violation*

Defendant maintains that the Lake County public defender's office was deficient in the areas of training, supervision and the use of investigative and mitigation services in capital cases, and that attorney Pantsios personally lacked adequate training in defense of capital cases. Defendant submits that these circumstances constitute "resource deprivation" and give rise to a *per se* violation of the sixth amendment right to counsel. As has been seen, ineffective-assistance claims are ordinarily evaluated in accordance with the *Strickland* test which requires a showing of deficient performance and resultant prejudice. However, defendant cites *United States v. Cronic* (1984), 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039, which noted that in some situations ineffective assistance may be presumed without inquiry into counsel's actual performance.

In *Cronic*, the defendant was charged with mail fraud in connection with a "check kiting" scheme. An inexperienced lawyer with a real estate practice was appointed substitute counsel for the accused and was afforded 25 days to prepare for trial. The *Cronic* Court indicated that "[c]ircumstances *** may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." (*Cronic*, 466 U.S. at 659-60, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047.) To illustrate, the

*Cronic* Court cited *Powell v. Alabama* (1932), 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55. In *Powell* the defendants had been indicted for a highly publicized capital crime. Six days before trial, the trial court appointed "all members of the bar" for purposes of arraignment. On the day of trial an out-of-State attorney appeared in court, but indicated that he was unwilling to assume the defense of the accused because he was unfamiliar with the case and local procedures. Notwithstanding his protestations, the attorney was appointed to represent the defendants with whatever help the local bar could provide. In the *Cronic* Court's view, these circumstances in *Powell* justified a presumption of prejudice. In *Cronic* itself, however, the Court found that the circumstances surrounding the defendant's representation—the lawyer's level of experience and the time for trial preparation—did not justify a similar presumption. With regard to the former circumstance, the Court stated that "[t]he character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation." *Cronic,* 466 U.S. at 665, 80 L. Ed. 2d at 672, 104 S. Ct. at 2050.

The *per se* approach suggested in *Cronic* is "in all events the exception, not the rule." (*Scarpa v. Dubois* (1st Cir. 1994), 38 F.3d 1, 12.) We believe the exception is properly limited to cases involving circumstances of a similar magnitude to those in *Powell.* Moreover, the character of the circumstances, as well as their magnitude, is significant. The *per se* approach is available when the circumstances are such that "any lawyer, even a fully competent one" would be unlikely to be able to provide effective assistance. (*Cronic,* 466 U.S. at 659-60, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047.) Thus, *Cronic* contemplates an inquiry into the circumstances surrounding the defendant's representation in a particular

case; it does not envision scrutiny of the attorney's overall competence. Consequently, the lawyer's lack of relevant practice experience in *Cronic* was viewed by the Court as a factor in evaluating his actual performance, but did not justify a presumption of ineffective assistance of counsel.

While defendant styles his claim as one of "resource deprivation," the thrust of his allegations goes to a narrow aspect of the overall competence of his attorneys and the Lake County public defender's office to represent capital defendants. (There appears to be no dispute that the attorneys were experienced and capable in the area of criminal defense generally.) The general allegations in this case of inadequate training and deficient office practices do not demonstrate circumstances of either the character or magnitude that would give rise to a *per se* ineffective assistance of counsel claim.

### B. Waiver of Counsel in a Capital Case

Defendant argues that his constitutional rights were violated when the trial court permitted him to waive counsel in a capital case. In *Faretta v. California* (1975), 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525, the Court held that a criminal defendant has a constitutional right to refuse State-provided counsel and proceed without representation if he voluntarily and intelligently elects to do so. (See *Silagy v. Peters* (7th Cir. 1990), 905 F.2d 986, 1007.) Defendant contends, however, that *Faretta* is not controlling here because it was not a capital case. Defendant argues that the death penalty has been recognized to be qualitatively different from other forms of punishment. (See *Gardner v. Florida* (1977), 430 U.S. 349, 357, 51 L. Ed. 2d 393, 401, 97 S. Ct. 1197, 1204 (plurality opinion).) The eighth amendment requires increased reliability of the process by which capital punishment may be imposed. (*Herrera v. Collins* (1993), 506 U.S. 390, 404, 122 L. Ed. 2d 203, 219, 113 S. Ct.

853, 863.) It is defendant's position that the demands of increased reliability in the capital setting require that the accused be represented by counsel notwithstanding his own desire to conduct his defense *pro se*. We disagree.

In *Faretta*, the Court explained:

"Although not stated in the [Sixth] Amendment in so many words, the right to self-representation—to make one's own defense personally—is \*\*\* necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.

The counsel provision supplements this design. It speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. \*\*\* It is true that when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas. [Citations.] This allocation can only be justified, however, by the defendant's consent, at the outset, to accept counsel as his representative. An unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction." *Faretta*, 422 U.S. at 819-21, 45 L. Ed. 2d at 572-73, 95 S. Ct. at 2533-34.

This reasoning applies with no less force in a capital case than in other cases. We are not persuaded by defendant's argument that the heightened need for reliability in capital cases justifies forcing the accused to accept representation by counsel. Defendant's argument assumes that the representation by counsel is *invariably* beneficial to the accused. However, in *Faretta* the Court noted that it is conceivable that in rare instances

the accused may be able to present his case more effectively by conducting his own defense than entrusting his defense to counsel. Moreover, as the Court observed, "[p]ersonal liberties are not rooted in the law of averages." *Faretta*, 422 U.S. at 834, 45 L. Ed. 2d at 581, 95 S. Ct. at 2540.

In *People v. Silagy* (1984), 101 Ill. 2d 147, 179-81, this court implicitly rejected a distinction between capital and noncapital cases for purposes of the right to self-representation. Reviewing the district court judgment in Federal *habeas corpus* proceedings related to *Silagy*, the United States Court of Appeals for the Seventh Circuit explicitly held that the right to self-representation applies in capital sentencing proceedings. (*Silagy v. Peters* (7th Cir. 1990), 905 F.2d 986, 1007-08.) The Seventh Circuit noted that in *Faretta*, the Court did not impose any restrictions upon a defendant's right to refuse the assistance of counsel except to require that the right be "knowingly and intelligently" waived. (*Silagy*, 905 F.2d at 1007.) The *Silagy* court further stated that it could "think of no principled reason to deny a death-eligible defendant his *Faretta* right to proceed without the assistance of counsel." (*Silagy*, 905 F.2d at 1007.) Accordingly, the trial court did not err in honoring defendant's request to conduct his own defense during portions of the original proceedings.

### C. Jury Exposure to Pretrial Publicity

Defendant contends his right to a fair trial was compromised because certain members of the jury were exposed to pretrial publicity about the case. Specifically, defendant contends that several jurors were aware that he had already been convicted in other jurisdictions of offenses occurring during the alleged crime spree following the Vernita Wheat murder.

At the outset, we note that defendant, acting *pro se*, accepted each of the jurors in question. The failure to

challenge a juror for cause or by peremptory challenge waives any objection to that juror. (*People v. Collins* (1985), 106 Ill. 2d 237, 271.) Considerations of waiver aside, defendant's argument is meritless. A juror's exposure to publicity about a case is not enough to demonstrate prejudice; jurors need not be totally ignorant of the facts and issues involved. (*People v. Sutherland* (1992), 155 Ill. 2d 1, 15.) What is essential is the juror's ability to lay aside impressions or opinions and return a verdict based upon the evidence presented in court. *Sutherland*, 155 Ill. 2d at 16.

In order to minimize the impact of pretrial publicity, the jury was selected from a pool composed of residents of Rock Island County, rather than Lake County, where the offense occurred. While defendant contends that five jurors were aware of his convictions in other jurisdictions, review of the record reveals that only two of the jurors identified by defendant had such knowledge. Those jurors had only minimal knowledge of the defendant's other offenses and were apparently unfamiliar with the details of those offenses. Both of the jurors indicated that they believed they could disregard defendant's prior convictions and decide the issues based solely on the evidence.

A juror's knowledge of the accused's prior convictions for other offenses does not create a presumption of prejudice. (*Murphy v. Florida* (1975), 421 U.S. 794, 44 L. Ed. 2d 589, 95 S. Ct. 2031.) Defendant attempts to distinguish *Murphy* on the basis that, unlike the case at bar, the prior convictions in *Murphy* did not arise from the same "crime spree" as the pending charges. We do not find the distinction to be persuasive. Whatever the *content* of the pretrial publicity, from a constitutional standpoint the ultimate question remains whether the juror is "to be believed when he says he has not formed an opinion about the case." (*Mu'Min v. Virginia* (1991),

500 U.S. 415, 425, 114 L. Ed. 2d 493, 506, 111 S. Ct. 1899, 1905 (holding that the accused is not constitutionally entitled to inquire as to the content of pretrial publicity to which prospective jurors have been exposed).) The jurors in question offered their assurances of impartiality, and defendant points to nothing casting suspicion on those assurances.

We note parenthetically that inflammatory pretrial publicity may sometimes rise to a level creating "such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." (*Patton v. Yount* (1984), 467 U.S. 1025, 1031, 81 L. Ed. 2d 847, 854, 104 S. Ct. 2885, 2889, citing *Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639.) However, the jury in this case was selected in Rock Island County, not Lake County, where the offense occurred. Nothing indicates that pretrial publicity generated a sense of community outrage in Rock Island County.

Defendant also contends that some jurors may have been aware that defendant had previously been sentenced to death in other jurisdictions, thus diminishing the jurors' sense of responsibility for imposing the death penalty in the case at bar. The record provides no support for defendant's contention that any members of the jury were aware he had previously been sentenced to death.

### D. Peremptory Challenges to Jurors Expressing Reservations About the Death Penalty

Defendant argues that the trial court erred in allowing the State to exercise peremptory challenges against certain prospective jurors who expressed some reservations about the death penalty, but whose views did not rise to the level of cause under *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, and its progeny. Under *Witherspoon*, a prospective juror may

not constitutionally be excused for cause based on general objections to the death penalty on moral or religious grounds. Defendant contends that through the use of peremptory challenges the State was able to achieve what it could not achieve through the use of challenges for cause: "a jury uncommonly willing to condemn a man to die" (*Witherspoon*, 391 U.S. at 521, 20 L. Ed. 2d at 784, 88 S. Ct. at 1776). On several occasions, this court has held that *Witherspoon* does not limit the use of peremptory challenges. (*People v. Williams* (1994), 161 Ill. 2d 1, 55-56; *People v. Howard* (1991), 147 Ill. 2d 103, 136-38; *People v. Stewart* (1984), 104 Ill. 2d 463, 481-82.) Defendant acknowledges these decisions but urges us to reconsider them. However, we find no persuasive reason to depart from this court's holdings in this area. Accordingly, the circuit court properly dismissed this post-conviction claim.

### E. Death-Qualified Jury

Defendant contends that it was improper to allow "death qualification" of the jury. Defendant maintains that in a case where the same jury determines guilt and decides whether the death penalty will be imposed, it is impermissible to excuse prospective jurors for cause based on their views about the death penalty even when the standard for exclusion under *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, and its progeny has been satisfied. Defendant acknowledges that in *Lockhart v. McCree* (1986), 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758, the United States Supreme Court upheld the use of *Witherspoon* challenges in capital cases where a single jury sits at both the guilt and sentencing phases. However, defendant argues that we should prohibit "death qualification" under the due process clause of our State constitution (Ill. Const. 1970, art. I, § 2). We find no persuasive reason to do so.

Even prior to *McCree*, on several occasions this court

rejected the argument that qualification of prospective jurors pursuant to *Witherspoon* results in a conviction-prone jury, denying the accused a fair trial. (See *People v. Collins* (1985), 106 Ill. 2d 237, 278 (and cases cited).) Shortly after *McCree* was decided, this court stated that upon independent consideration of the matter, the court perceived no State constitutional basis for departing from its prior cases and the United States Supreme Court's position on the same issue. (*People v. Sanchez* (1986), 115 Ill. 2d 238, 266.) Accordingly, defendant's contention that "death qualification" violates our State constitution is meritless.

F. Death Eligibility Under the Multiple Murders Factor
Based on Subsequent Murders

Defendant was found eligible for the death penalty under the multiple-murder eligibility factor (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(3)) on the basis of convictions for other murders which occurred after the murder of Vernita Wheat. Defendant argues that because at the time of the Vernita Wheat murder the other murders had not yet been committed, he had no notice of his eligibility for the death penalty, and imposition of the death penalty violates due process. In support of this argument, defendant relies exclusively on *Bouie v. City of Columbia* (1964), 378 U.S. 347, 12 L. Ed. 2d 894, 84 S. Ct. 1697. In *Bouie,* the Court recited the venerable due process axiom that a criminal statute must be " 'sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties.' " (*Bouie,* 378 U.S. at 351, 12 L. Ed. 2d at 898, 84 S. Ct. at 1701, quoting *Connally v. General Construction Co.* (1926), 269 U.S. 385, 391, 70 L. Ed. 322, 328, 46 S. Ct. 126, 127.) We fail to see how that principle was offended here. The relevant statutory provision placed defendant on notice that after the murder of Vernita Wheat, the commission of additional murders in Illinois

or another jurisdiction would make him eligible for the death penalty. We further note that this court has previously held that the multiple-murder eligibility factor does not violate due process simply because eligibility may be based on conduct occurring after the murder for which punishment is imposed. See *People ex rel. Daley v. Strayhorn* (1988), 121 Ill. 2d 470, 483.

In a related point, defendant notes that in *People v. Albanese* (1984), 104 Ill. 2d 504, this court held for the first time that a defendant could be found eligible for the death penalty under the multiple-murder factor on the basis of murders committed after the murder for which the defendant was being sentenced. Defendant contends that because *Albanese* was decided after the Vernita Wheat murder, he did not have notice of this interpretation of the statutory eligibility factor. In *Bouie*, the Court held that "an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law" and is forbidden by the due process clause. (*Bouie*, 378 U.S. at 353-54, 12 L. Ed. 2d at 899-900, 84 S. Ct. at 1702-03.) However, *Albanese* hardly represents an "unforeseeable judicial enlargement" of the multiple-murder eligibility factor. Instead, *Albanese* simply held that under the plain language of the statute, eligibility pursuant to the multiple-murder factor does not depend on the sequence of the murders. (*Albanese*, 104 Ill. 2d at 533-34.) A judicial decision which merely interprets a statute in accordance with its plain and unambiguous language does not operate like an *ex post facto* law. Defendant's argument is without merit.

### G. Evidence of the Death Penalty's Lack of a Deterrent Effect

Defendant contends that the trial court erred in granting the State's motion *in limine* barring defendant from introducing evidence that the death penalty has

proved ineffective as a deterrent to crime. In *People v. Williams* (1983), 97 Ill. 2d 252, 301, this court held that such testimony is improper, noting that "[a]rguments against the death penalty in general and not containing evidence in mitigation are inadmissible." Defendant seeks to distinguish *Williams,* noting in that case the witnesses whose testimony was barred would have testified as to their beliefs about the unwisdom and immorality of the death penalty and the repellant nature of an execution in the electric chair, in addition to the death penalty's lack of deterrence. However, this court concluded that *none* of this evidence was admissible. Accordingly, defendant's argument is without merit.

## H. Constitutionally Infirm Jury Instructions at Sentencing

Citing *People ex rel. Free v. Peters* (N.D. Ill. 1992), 806 F. Supp. 705, defendant argues that the instructions to the jury at sentencing result in the arbitrary and unguided imposition of the death penalty in violation of the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV). As defendant acknowledges, the United States Court of Appeals for the Seventh Circuit reversed the district court decision in *Free,* concluding that the jury instructions are not constitutionally infirm. (*Free v. Peters* (7th Cir. 1993), 12 F.3d 700.) This court has previously endorsed the Seventh Circuit's reasoning on this question. (*People v. Franklin* (1995), 167 Ill. 2d 1, 29; *People v. Kokoraleis* (1994), 159 Ill. 2d 325, 333-34; see also *People v. Thomas* (1995), 164 Ill. 2d 410, 432.) While defendant urges us to reconsider the question, we see no persuasive reason to depart from our holdings. The circuit court properly dismissed defendant's post-conviction claims alleging unconstitutional jury instructions at sentencing.

## I. Natural Life Instruction

Because of defendant's multiple murder convictions, the only sentencing alternative to the death penalty was natural life imprisonment. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1).) Defendant contends that the trial court erred in refusing his tendered instruction informing the jury that if the death penalty were not imposed, he would receive a mandatory natural life sentence. Instead, the jury was simply instructed that if defendant were not sentenced to death the trial court would sentence him to a term of imprisonment. See Illinois Pattern Jury Instructions, Criminal, No. 7A.01 (2d ed. 1981).

This court addressed the same issue in defendant's direct appeal. (*People v. Coleman* (1989), 129 Ill. 2d 321, 348-49.) The court noted that in *People v. Gacho* (1988), 122 Ill. 2d 221, a prospective rule was announced requiring jurors to be informed of the mandatory natural life sentence for offenders convicted of multiple murders who do not receive the death penalty. However, because defendant's sentencing occurred prior to the decision in *Gacho*, it did not apply to his case. (*Coleman*, 129 Ill. 2d at 348.) This court further held that the *Gacho* rule was not of constitutional dimension, and thus rejected the argument that under the principles of *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708, *Gacho* applied retroactively to cases pending on direct review when it was announced. (*Coleman*, 129 Ill. 2d at 349.) Defendant currently attempts to offer slightly different rationales for applying *Gacho* retroactively. However, because the issue has already been decided, the doctrine of *res judicata* precludes reconsideration of the issue. See *People v. Franklin* (1995), 167 Ill. 2d 1, 23.

Defendant also cites the United States Supreme Court's decision in *Simmons v. South Carolina* (1994), 512 U.S. 154, 129 L. Ed. 2d 133, 114 S. Ct. 2187, in support of his claim that the jury should have been

instructed on mandatory natural life imprisonment for multiple murders. In *Simmons*, the Court held that if the defendant's future dangerousness is at issue and under State law the only sentencing alternative to the death penalty is life imprisonment without parole, due process requires that the sentencing jury be accurately informed of that alternative.

This court has yet to decide whether *Simmons* applies retroactively in post-conviction proceedings where the defendant's conviction and sentence were affirmed on direct review before *Simmons* was decided. (See *Franklin*, 167 Ill. 2d at 24-25.) Assuming for the sake of argument that *Simmons* does apply retroactively, defendant's reliance on *Simmons* is misplaced. In *Simmons*, the prosecution specifically raised the issue of the defendant's future dangerousness during closing argument by asking the jury "what to do with [the defendant] now that he is in our midst" and by stating that a death sentence would be "a response of society to someone who is a threat. Your verdict will be an act of self-defense." (*Simmons*, 512 U.S. at 157, 129 L. Ed. 2d at 139, 114 S. Ct. at 2190-91.) The Court held, in essence, that due process entitled the defendant to inform the jury that if sentenced to life imprisonment he would never be released on parole in order to rebut the prosecution's argument that, if not executed, defendant would pose a threat to society. (*Simmons*, 512 U.S. at 163, 129 L. Ed. 2d at 142, 114 S. Ct. at 2193 (plurality opinion); *Simmons*, 512 U.S. at 178, 129 L. Ed. 2d at 151, 114 S. Ct. at 2201 (O'Connor, J., concurring, joined by Rehnquist, C.J., and Kennedy, J.).) We note that no majority opinion was delivered in *Simmons*. The reasoning of the plurality opinion *might* arguably apply in situations where the State does not argue future dangerousness. However, only a more limited rule applicable where the prosecution specifically argues future dangerousness

received the support of a majority of the members of the Court. (See Note, *Simmons v. South Carolina: Safeguarding a Capital Defendant's Right to Fair Sentencing*, 26 Loy. U. Chi. L.J. 511, 539-40 (1995).) Here, unlike *Simmons*, the State did not rely on future dangerousness in its argument to the jury as a reason for imposition of the death penalty. Thus *Simmons* does not apply.

Defendant appears to acknowledge that the prosecution did not raise the issue of future dangerousness. However, defendant maintains that the pre-*Gacho* instruction given here itself raises the issue of future dangerousness. We disagree. While the instruction may not *dispel* concerns of future dangerousness as effectively as a *Gacho* instruction, neither does the instruction *raise* the issue of future dangerousness in the sense contemplated by *Simmons*. Defendant also contends that the State in effect misled the jury about sentencing alternatives. During his closing argument at the aggravation/mitigation stage of sentencing, defendant intimated that if the death penalty was not imposed, he would receive a life sentence. The trial court sustained the State's objection to these remarks. Even if the State's objection could somehow be viewed as misleading, defendant's argument would fail. Citing a footnote in the plurality opinion, defendant contends that *Simmons* embraces a general principle that the prosecutor may not mislead the jury. In context, the comments in the footnote to which defendant refers are clearly limited to cases where the prosecution has placed future dangerousness at issue. (*Simmons*, 512 U.S. at 165 n.5, 129 L. Ed. 2d at 143 n.5, 114 S. Ct. at 2194 n.5 ("[T]he State may not mislead the jury by concealing accurate information about the defendant's parole ineligibility. The Due Process Clause will not tolerate placing a capital defendant in a straitjacket by barring him from rebutting the prosecution's arguments of future

dangerousness with the fact that he is ineligible for parole under state law").) Thus *Simmons* does not support defendant's claim that he was constitutionally entitled to have the jury instructed on the mandatory natural life sentence for multiple murder convictions.

J. Reliability of the Sentencing Phase Verdict

Defendant claims that the trial judge erred in allowing the jury to deliberate on whether the death penalty should be imposed without first hearing mitigating evidence of his background and mental or emotional condition. According to defendant the absence of such evidence undermined the reliability of his sentence in contravention of the guarantees of the eighth amendment.

Courts in other jurisdictions have considered and rejected the argument that the eighth amendment requires that mitigating evidence must somehow be presented on a defendant's behalf notwithstanding the defendant's choice to refrain from introducing it. In *Wallace v. State* (Okla. Crim. App. 1995), 893 P.2d 504, the defendant argued that the eighth amendment requires the sentencer to consider mitigating evidence to reach a rational and individualized determination of the appropriate sentence and when the defendant refused to present such evidence the death sentence was imposed in an arbitrary and unreliable manner. Quoting from the decision of the Supreme Court of California in *People v. Bloom* (1989), 48 Cal. 3d 1194, 774 P.2d 698, 259 Cal. Rptr. 669, the *Wallace* court responded:

" '[T]he required reliability is attained when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, *which the defendant has chosen to present.* A judgment of

death entered in conformity with these rigorous standards does not violate the Eighth Amendment reliability requirements.'" (Emphasis added.) (*Wallace*, 893 P.2d at 511, quoting *Bloom*, 48 Cal. 3d at 1228, 774 P.2d at 719, 259 Cal. Rptr. at 690.)

(Accord *Silagy v. Peters* (7th Cir. 1991), 905 F.2d 986, 1008.) We agree and find this reasoning consistent with language in decisions of this court and the United States Supreme Court indicating that the eighth amendment is complied with where the defendant has the opportunity to present mitigating evidence. (See *People v. Silagy* (1984), 101 Ill. 2d 147, 181 ("Society's interest in the proper administration of justice is preserved by giving a defendant the right freely to present evidence in mitigation"); *Wallace*, 893 P.2d at 510 n.4 (and cases cited).) In the case at bar, defendant did in fact present some mitigating evidence relating to his desire to find peace with God. Defendant now claims that other mitigating evidence should have been introduced, but because he was afforded a complete opportunity to present mitigating evidence as he saw fit, and because rigorous procedural standards were adhered to in connection with sentencing, defendant's sentence is not constitutionally unreliable.

K. Racial Discrimination in Sequence of Prosecutions

Defendant alleges in his post-conviction petition that representatives of the State met with prosecutors in other jurisdictions to determine the sequence of prosecutions arising from defendant's alleged multistate crime spree, and that as a result it was decided that defendant would first be tried for the murder of Marlene Walters, the only white victim among the several alleged murder victims. While defendant contends that this decision violated his constitutional rights, he has failed to cite any pertinent authority or advance any meaningful argument or analysis in support of this contention. Ac-

cordingly, the issue is waived. See *People v. Patterson* (1992), 154 Ill. 2d 414, 472.

L. Constitutionality of the Death Penalty

Defendant finally urges us to abolish the death penalty altogether. In *Gregg v. Georgia* (1976), 428 U.S. 153, 187, 49 L. Ed. 2d 859, 882-83, 96 S. Ct. 2909, 2931-32, the United States Supreme Court rejected the proposition that imposition of the death penalty for the crime of murder is, under all circumstances, cruel and unusual punishment under the eighth and fourteenth amendments to the United States Constitution. Defendant argues that *Gregg* should be "overruled." Defendant also contends that in view of the international trend disfavoring the death penalty, capital punishment is contrary to evolving standards of due process. Defendant has failed to cite any pertinent authority or advance any meaningful analysis in support of this contention. As presented, this argument and defendant's related assertion that the death penalty is violative of the United Nations Charter are without merit.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Lake County dismissing or denying each of defendant's post-conviction claims is affirmed. The clerk of this court is directed to enter an order setting Tuesday, January 23, 1996, as the date on which the sentence of death, entered in the circuit court of Lake County, is to be carried out. Defendant shall be executed in the manner provided by law. (Ill. Rev. Stat. 1991, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of the mandate to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

JUSTICE MILLER, concurring:

I concur in the judgment of the court, and I join much of the court's opinion. Unlike the majority, however, I would reject the defendant's claim of ineffective assistance of counsel at the second stage of the sentencing hearing squarely on the ground that the defendant, acting *pro se* at that time, can make no claim that counsel was ineffective. See *McKaskle v. Wiggins* (1984), 465 U.S. 168, 177 n.8, 79 L. Ed. 2d 122, 133 n.8, 104 S. Ct. 944, 950 n.8; *Faretta v. California* (1975), 422 U.S. 806, 834 n.46, 45 L. Ed. 2d 562, 581 n.46, 95 S. Ct. 2525, 2541 n.46, *People v. Gibson* (1990), 136 Ill. 2d 362, 382.

Six days before trial, the defendant chose to proceed *pro se*. The two public defenders who had been representing the defendant were then appointed to act as standby counsel. Following the defendant's conviction for murder and aggravated kidnapping, the State asked for a death penalty hearing. For the first stage of the sentencing hearing, the defendant requested the assistance of counsel, and the two public defenders represented him during that portion of the case. At the second stage of the hearing, however, the defendant once more waived the assistance of counsel, and the two public defenders again acted only as standby counsel. The only evidence in mitigation presented by the defendant was the testimony of a clergyman. (*People v. Coleman* (1989), 129 Ill. 2d 321, 331.) The defendant now contends that additional evidence in mitigation could have been introduced at the death penalty hearing.

To avoid the principle that a person proceeding *pro se* may not later complain that he received the ineffective assistance of counsel, the defendant attempts to couch the present argument in terms of the attorneys' failure to adequately prepare for the sentencing hearing during the period when they were still representing

him. Thus, the defendant states in his reply brief that counsel in this case "neglected to obtain [mitigating] evidence in a manner which would allow it to be introduced at the sentencing hearing and thereby prevented the Petitioner from having any chance of presenting such evidence after the Attorneys' discharge." Nowhere, however, does the defendant explain in what way the conduct of his former attorneys actually prevented him from introducing evidence in mitigation. This is not a case in which former counsel's conduct later precluded a defendant, then *pro se*, from introducing evidence, presenting a motion, or doing anything else. Here, the defendant seeks merely to avoid the consequences of his decision to represent himself during the second stage of the sentencing hearing.

To succeed on a claim of this nature, the defendant should be required to establish, at the least, that actions of the defense attorneys prior to their withdrawal from the case actually prevented the defendant from accomplishing something he would otherwise have been able to do while acting *pro se*. To suggest otherwise means that counsel not only must prepare, on the schedule they determine, the case they believe they will be presenting, but also must anticipate their eventual unemployment and do in advance whatever additional preparation the *pro se* defendant's case will require.