NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180134-U

NO. 4-18-0134

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 6, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Morgan County |
| GLEN E. SNYDER JR., | ) | No. 16CF1 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Christopher E. Reif, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Steigmann and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding (1) the record insufficient to review defendant's claim of ineffective assistance of counsel and (2) the trial court did not abuse its discretion when fashioning defendant's 15-year sentence.

¶ 2    In January 2016, the State charged defendant, Glen E. Snyder Jr., with one count of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2014)). In June 2017, a jury found defendant guilty, and the trial court subsequently sentenced him to serve 15 years' imprisonment in the Illinois Department of Corrections (IDOC). In August 2017, defendant filed a motion to reconsider sentence, which the trial court later denied.

¶ 3    Defendant appeals, arguing (1) he was denied effective assistance of trial counsel and (2) his sentence was excessive. We affirm.

¶ 4                          I. BACKGROUND

¶ 5          In January 2016, the State charged defendant by information with one count of

criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2014)), alleging defendant committed

an act of sexual penetration with C.B., who was under 18 years of age, and defendant was a

family member of the victim.

¶ 6                          A. Jury Trial

¶ 7          In June 2017, the matter proceeded to trial, during which the jury heard the

following evidence.

¶ 8                          1. *C.B.*

¶ 9          C.B., born in 2001 and 16 years old at the time of trial, testified defendant was her

father and that she currently lived in Missouri with her mother, S.B.  In late 2014, C.B. and her

mother moved into defendant's residence in Jacksonville, Illinois, along with defendant's wife

and their three young children.  C.B. indicated she and her mother slept on a "blow-up bed in the

middle of the living room" and that she and defendant initially had a "dad-and-daughter

relationship."

¶ 10          At some point after moving in with defendant and his family, C.B. testified she

and defendant were watching a movie in defendant's bedroom.  C.B. testified they were both

clothed and that she began "dry-humping" defendant after he said something, although she could

not remember "exactly what he said."  C.B. stated the incident lasted approximately "five

minutes."  When questioned why she remained silent about what happened, C.B. responded,

"Because [defendant] told me that if I told anyone that he would kick me and my mother out of

the house."

¶ 11        C.B. testified another incident happened while she and defendant "were watching 'Lost,' and he was sitting on the couch, and [she] was sitting on the couch also." While alone in the living room, C.B. recalled defendant touching her vagina "[b]elow the clothing" after defendant covered them with a blanket. Defendant took C.B. into his bedroom and "he pulled down his pants and put a condom on and put a towel on the bed and then pulled down [her] pants and propped [her] up on the bed and put his penis in [her] vagina."

¶ 12        C.B. testified a third incident took place again in defendant's bedroom. According to C.B., defendant "put a towel on the bed. He pulled down his pants and [her] pants, and then he put his penis in [her]." C.B. stated defendant told her "to give him a blow job" after.

¶ 13        C.B. described the fourth incident occurring in the bathroom after coming home from a school dance. C.B. testified defendant came in and told her "that he had to use the restroom, and then he pulled down his pants and lifted up [her] dress and put [her] in his lap" while sitting on the toilet. C.B. further testified defendant's "penis was going up" inside her and defendant "took [her] hips and moved [her] up and down."

¶ 14        In June 2015, C.B. and her mother moved out of defendant's residence after C.B. "threw a big fit." C.B. stated she "was throwing things" and "punched a hole in the wall." Three months after moving, C.B. told her mother about the prior sexual abuse, stating she was "really depressed" because the incidents were on her mind almost "every single day." When asked by defense counsel if she remembered why she threw the fit and punched the wall, C.B. remembered it being due to "having flashbacks of what happened."

¶ 15                            2. *Kyle Chumley*

¶ 16        Jacksonville police detective Kyle Chumley testified he was assigned to the investigative division within the Jacksonville Police Department (JPD). After watching an

interview of C.B., conducted by the Missouri Department of Social Services (Missouri DSS) in December 2015, Chumley and another investigator went to defendant's residence "to locate him to speak with him about the incident." Thereafter, Chumley conducted an interview with defendant at the JPD, which was played for the jury.

¶ 17 During Chumley's interview with defendant, defendant described several strange incidents with C.B. but indicated any inappropriate contact happened "once." One such incident occurred while defendant showered. Defendant stated "a couple days" passed since he last bathed. At the time defendant went to take his shower, C.B. told him she needed to take one as well. Defendant stated he "hopped in" and C.B. "hopped in with [him]." According to defendant, C.B.'s "excuse" for getting in was because his other daughters got to do things with him, so defendant "brushed it off" and "let it slide." Defendant stated he "looked at her" when she got in, "turned around," and "kept [his] back to her." Defendant told C.B. "let's get this done; I'm out of here." Afterwards, defendant indicated he felt "edgy" around C.B.

¶ 18 Defendant claimed another incident happened after he stayed awake for two days playing video games. Defendant indicated he went to bed after the children left for school. The next thing defendant remembered was "feeling stuff." Defendant explained it felt like "someone fiddling down below" in his "genital area." Defendant stated he was "so tired" that it was "pretty easy" to fall back asleep. Defendant again "woke up to another sense of feeling" and realized it was C.B. Defendant claimed C.B "was on top" of him and knew the feeling to be sex. Defendant indicated C.B.'s "knees were forward" towards him and remembered pushing her off after realizing she was "not [his] wife." Defendant recalled saying, "what the f*** are you doing" and C.B. putting on her shorts. After putting on his jeans, defendant stated he "dragged her out by her hair." Defendant admitted knowing it was child abuse, but he "dragged her out

- 4 -

anyway." Later that evening, S.B. came back from work. Defendant stated S.B. "just heard [them] fighting, and she walked right outside—she didn't want no part of it." Defendant told S.B. to "get you're a*** in here" and admitted being "cruel to her." According to defendant, C.B. disclosed being raped before he had a moment to speak with S.B. Defendant recalled S.B.'s reaction as "shocked at first" and asking her to come to his bedroom "and talk." After walking into his bedroom, defendant stated C.B. "was hitting everything" and "hit a hole" in his wall.

¶ 19 After telling S.B. "exactly what happened," defendant explained she put her hands by her face and started shaking. Defendant stated his wife came home later "that night" but he and S.B. agreed "not to tell her right off the bat." "A couple days later," defendant told his wife "things happened" between him and C.B. Defendant indicated he never called the police but admitted he "should have."

¶ 20 Sometime later, defendant and C.B. got into another fight due to defendant "not letting her ride her bike." Defendant kicked S.B. and C.B. out "that day." Defendant stated he continued talking to S.B. "almost every day" on Facebook until the communication abruptly ended. Defendant did not contact C.B. after their last fight.

¶ 21 Defendant recalled another incident wherein C.B. laid her head on his lap and asserted there was "no flesh on flesh." The last incident defendant recalled occurred while he was "fixing the lawn mower" and C.B. was "fixing the grill" in the backyard. After finishing their projects, defendant gave C.B. a hug but the hug was "longer" and C.B. "pushed her body" against him. Defendant also claimed C.B. gave him a "little kiss." Defendant recalled "kind of turning away" and C.B. trying to kiss him again. Defendant indicated he "didn't make a big deal out of that" because he knew C.B. and S.B. "were gone soon."

¶ 22　　　　At the conclusion of the interview, defendant stated, "I already know how this looks" and that he was "screwed" given C.B.'s allegations against him and S.B. being her mother.

¶ 23　　　　During cross-examination, Chumley testified he never personally interviewed C.B., S.B., or defendant's wife. Chumley stated he attempted to speak with defendant's wife, but she was "very aggressive" towards him so he did not conduct further questioning. When asked why he never interviewed C.B. or her mother, Chumley stated that the JPD has "a protocol that is set up to where the law enforcement officials do not speak to children victims of this nature" and indicated both were interviewed in Missouri by "the equivalent of who we would use as a, a forensic interviewer."

¶ 24　　　　　　　　　　　　　　　　3. *S.B.*

¶ 25　　　　S.B. testified she met defendant in her early twenties and had known him for over 20 years. At some point, S.B.'s relationship with defendant developed beyond friendship and she subsequently gave birth to their daughter, C.B. Prior to moving into defendant's residence, S.B. contacted defendant through Facebook Messenger because she "felt that he needed to know his daughter." S.B. recalled moving into defendant's home in September 2014, after defendant asked her "to consider it." Regarding the living arrangements, S.B. stated, "At first things were good." S.B. recalled living with defendant for 10 months until moving out "[d]ue to [C.B.] throwing a fit." S.B. was unaware what C.B.'s fit was about at the time.

¶ 26　　　　According to S.B., neither defendant, defendant's wife, nor C.B. alerted her to any inappropriate sexual contact between defendant and C.B. while living in Jacksonville. During cross-examination, S.B. reiterated never having a conversation with defendant after coming home from work about any inappropriate incident with C.B. In fact, S.B. stated she was

- 6 -

not aware of any abuse until three months after moving out of defendant's residence. S.B. recalled C.B. "getting distant" and "getting thrown by that." Eventually, C.B. disclosed the abuse while "sitting in [their] bedroom."

¶ 27                                    4. *Defendant*

¶ 28        Defendant testified on his own behalf and reiterated much of what he said in his interview with Chumley. Defendant learned about C.B. being his daughter during a Facebook conversation with S.B. Initially, defendant invited the pair to visit so he could "get to know [C.B.]" and "catch up on old times" with S.B. After discussing it with his wife, defendant invited S.B. and C.B. to move in, noting his wife's initial reaction to the arrangement "was ehhhh" but after defendant "gave the puppy eyes," she agreed to "try it."

¶ 29        On the day of "the big incident," defendant stated he "had an abscess" in his "lower right jaw" and "was taking pills and all that" to deal with the pain. Defendant testified staying awake for "[t]wo to three days" playing video games to keep his mind off the pain. Defendant finally "couldn't handle it anymore" and "had to get some sleep." After putting two children to bed, defendant "walked back into the living room" where C.B. and his other daughter "were playing Minecraft." Defendant "watched them for maybe two to five minutes" and "told them goodnight." Defendant recalled going to bed at "nine-thirty at night."

¶ 30        Defendant stated he woke up because he "still felt pain" in his abscess and remembered "being fiddled with down below." Defendant further explained, "Well, once I figured I'm being fiddled with, I thought it was my wife. I told her stop, *** I'm not feeling good." Defendant then "turned to the wall" and fell back asleep. Defendant woke again feeling "[a] little more pain," specifically in his "penis *** like it was bent, like bent wrong." Defendant remembered "[k]inda just waking up a little bit" and recalled the bedroom being "pitch black"

and touching a woman's knees that "didn't feel right." Defendant opened the bedroom curtain to let in "a little bit of light" and discovered C.B. on top of him "staying still." Defendant "bent [his] legs in, and *** kicked her," stating, "I kicked her pretty hard." Defendant specifically recalled the time being approximately 1:35 a.m. because he "noticed the clock *** on the computer desk" while buttoning his jeans.

¶ 31　　　At "around five" in the morning, S.B. arrived home from work. Defendant, having returned to his bedroom, "heard the door open" and "turned off the computer like real quick." Defendant claimed C.B. "spouted out 'Dad raped me. He raped me' " and S.B. immediately "put her coffee mug on a coffee table *** and she walked right back out." Defendant "opened the door" and told S.B., "no, you're going to get the hell up here, we're going to go talk." According to defendant, he and S.B. discussed "[e]verything" in his bedroom and claimed their next course of action was "[t]o try to fix [C.B.] *** to try, try to show her the right way, to the way [he] was."

¶ 32　　　During cross-examination, defendant admitted never attempting to get C.B. into counseling. Defendant asserted he was "[t]eaching her the right pathway to be honorful [*sic*]." Defendant never attempted to call the Department of Children and Family Services or the police. Defendant recalled his wife demanding S.B. and C.B. move out "plenty of times" after eventually disclosing everything and stated, "I kept telling her that I promised [S.B.] that we'd try and fix [C.B.]."

¶ 33　　　Following closing arguments, the jury found defendant guilty of criminal sexual assault.

¶ 34　　　　　　　　　　B. Sentencing

¶ 35    On August 8, 2017, the matter proceeded to sentencing, and the trial court sentenced defendant to 15 years' imprisonment. In doing so, the court stated it "considered the trial evidence as the Court sat through, the presentence investigation report and addendum, including the sex offender evaluation, the history, character, and attitude of the defendant, the evidence and arguments of counsel, and the statement of allocution presented." The court further stated it "considered the statutory factors in aggravation ***," noting the "serious harm to the victim" done by defendant and the necessity of a sentence "to deter others from committing such an offense." In mitigation, the court noted defendant's lack of "prior delinquency or criminal activity to speak of."

¶ 36    Furthermore, the court pointed to several factors "that *** make this a very easy sentence for this Court." The court agreed with the State that defendant failed to accept responsibility and "point[ed] blame at the victim repeatedly." The court stated further:

> "The defendant not only ruined a victim's life, but his other children's [lives], and I have to read letters from a spouse that also says she believes the victim was raped. That creates real concern for this Court—not that the Court can place any weight on that, but it creates issues and concerns for other children. *** I've never read probably such an inappropriate statement as to say I hope the victim gets raped so she would, quote, feel what I'm feeling."

¶ 37    On August 28, 2017, defendant filed a motion to reconsider sentence, arguing the sentence imposed was excessive, varying greatly with the spirit and purpose of the law and manifestly disproportionate to the seriousness of the offense. Defendant further alleged the trial court failed to adequately weigh and consider relevant mitigating factors. At a hearing in January 2018, the court denied defendant's motion.

¶ 38        This appeal followed.

¶ 39                            II. ANALYSIS

¶ 40                        A. Ineffective Assistance

¶ 41        Defendant first argues he was denied effective assistance of trial counsel where his counsel failed to impeach C.B. with her prior inconsistent statements made during an interview with the Missouri DSS. Defendant alleges the statements contained factual discrepancies regarding each of the sexual encounters C.B. alleged at trial. A supplemental police report attached to the presentence investigation report summarized a child advocacy interview of C.B.

¶ 42        A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11, 989 N.E.2d 192. To prevail on such a claim, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496, 931 N.E.2d 1198, 1203 (2010). To establish deficient performance, the defendant must show his attorney's performance fell below an objective standard of reasonableness. *People v. Evans*, 209 Ill. 2d 194, 219, 808 N.E.2d 939, 953 (2004) (citing *Strickland*, 466 U.S. at 687). To establish prejudice "[t]he defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Richardson*, 189 Ill. 2d 401, 411, 727 N.E.2d 362 (2000). "A reasonable probability is a probability sufficient to undermine confidence in the outcome, namely, that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *People v. Enis*, 194 Ill. 2d 361, 376-77, 743 N.E.2d 1, 11 (2000). " 'Effective assistance of counsel refers to competent, not

perfect representation.' " *Evans*, 209 Ill. 2d at 220 (quoting *People v. Stewart*, 104 Ill. 2d 463, 491-92, 473 N.E.2d 1227, 1240 (1984)). "The impeachment of witnesses is generally considered a matter of trial strategy, immune from claims of ineffective assistance of counsel." *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 58, 92 N.E.3d 544. "Mistakes in trial strategy or tactics do not necessarily render counsel's representation defective." *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 10, 93 N.E.3d 664. The only exception to this rule is when counsel's chosen trial strategy is so unsound that 'counsel entirely fails to conduct any meaningful adversarial testing.' " *People v. West*, 187 Ill. 2d 418, 432-33, 719 N.E.2d 664, 673 (1999) (quoting *People v. Guest*, 166 Ill. 2d 381, 394, 655 N.E.2d 873, 879 (1995)).

¶ 43        After reviewing the record, we conclude that it does not contain sufficient information to permit us to resolve defendant's claim that he was denied effective assistance of trial counsel. In reaching this conclusion, we are mindful that our supreme court recently addressed the propriety of appellate courts declining to consider certain claims of ineffective assistance of counsel on direct appeal. *People v. Veach*, 2017 IL 120649, ¶¶ 31, 39, 89 N.E.3d 366. In *Veach*, the defendant claimed his trial counsel was ineffective for stipulating to the admission of recorded statements of the State's key witnesses. *Veach*, 2017 IL 120649, ¶ 27. On direct appeal, the record contained defense counsel's reasons for making the stipulation and counsel's statements believing the use of the recordings for impeachment purposes opened the door for the State to admit character evidence and prior inconsistent statements. *Veach*, 2017 IL 120649, ¶ 51. Upon review, the supreme court cautioned that "ineffective assistance of counsel claims may sometimes be better suited to collateral proceedings *but only* when the record is incomplete or inadequate for resolving the claim." (Emphasis added.) *Veach*, 2017 IL 120649, ¶ 46. The supreme court further instructed reviewing courts to "carefully consider each

ineffective assistance of counsel claim on a case-by-case basis" to determine if the circumstances permit them to adequately address a defendant's ineffective assistance of counsel claim on direct review. *Veach*, 2017 IL 120649, ¶ 48. Given counsel's statements in the record, the supreme court concluded the record was sufficient to resolve the defendant's ineffective assistance claim on direct appeal. *Veach*, 2017 IL 120649, ¶ 50.

¶ 44    In this case, we are unable to conduct a meaningful review of defendant's claim without a supplemental record containing counsel's reasons for the manner in which he conducted the cross-examination of C.B. Without it, we are forced to speculate as to counsel's reasons for the challenged action. It is not unreasonable to conclude the use of C.B.'s prior statements during cross-examination might: (1) reinforce the incidents in the jurors' minds, (2) alienate counsel—and by extension, defendant in the minds of the jurors—by more rigorously cross-examining C.B., or (3) result in the disclosure of more details than had been presented on direct examination. However, such speculation would be a disservice to both parties.

¶ 45    The record is also silent as to what options defense counsel believed he had regarding the use of C.B.'s prior statements. Although defendant points to their absence from the record and their nonuse at trial, C.B.'s prior statements would have been available to defense counsel during discovery and he undoubtedly viewed them. We have no way of gleaning counsel's thought process in not using them at trial. We note the record contains no recording or transcript of C.B.'s prior statements. Although defendant relies on the summary police report, despite no indication that it was an effort to create a verbatim recitation of C.B.'s prior statements, we have no way to determine whether those statements were truly inconsistent or

whether there were statements that were potentially damaging to defendant's case if offered for impeachment.

¶ 46    Accordingly, we find defendant's claim better suited to postconviction proceedings, where defendant is permitted to supplement the record with the necessary supporting evidence to substantiate his claim. In support of this conclusion, we note that were we to reach the merits of defendant's ineffectiveness claim without a sufficient record, he would be precluded from raising this claim in a postconviction petition despite any evidentiary support he may provide in his petition. See *People v. Coleman*, 168 Ill. 2d 509, 522, 660 N.E.2d 919, 927 (1995) (issues decided on direct appeal are barred from being raised in subsequent proceedings by *res judicata*).

¶ 47    B. Excessive Sentence

¶ 48    Defendant next argues the trial court abused its discretion when it imposed defendant's 15-year sentence, given the nature of the offense and evidence presented in mitigation. We disagree.

¶ 49    The Illinois Constitution mandates "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. " 'In determining an appropriate sentence, a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment, must be equally weighed.' " *People v. Hestand*, 362 Ill. App. 3d 272, 281, 838 N.E.2d 318, 326 (2005) (quoting *People v. Hernandez*, 319 Ill. App. 3d 520, 529, 745 N.E.2d 673, 681 (2001)). However, "the seriousness of an offense is considered the most important factor in determining a sentence." *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 53, 23 N.E.3d 430.

¶ 50      With excessive sentence claims, this court has explained appellate review of a

defendant's sentence as follows:

> "A trial court's sentencing determination must be based on
> the particular circumstances of each case, including factors such as
> the defendant's credibility, demeanor, general moral character,
> mentality, social environment, habits, and age.  [Citations.]
> Generally, the trial court is in a better position than a court of
> review to determine an appropriate sentence based upon the
> particular facts and circumstances of each individual case.
> [Citation.]  Thus, the trial court is the proper forum for the
> determination of a defendant's sentence, and the trial court's
> decisions in regard to sentencing are entitled to great deference and
> weight.  [Citation.]  Absent an abuse of discretion by the trial
> court, a sentence may not be altered upon review [Citation.]."
> (Internal quotation marks omitted.)  *People v. Price*, 2011 IL App
> (4th) 100311, ¶ 36, 958 N.E.2d 341 (quoting *People v. Hensley*,
> 354 Ill. App. 3d 224, 234-35, 819 N.E.2d 1274, 1284 (2004)).

¶ 51      An abuse of discretion will not be found unless the court's sentencing decision is

"arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by

the trial court."  *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 26, 82 N.E.3d 693.  Also, an

abuse of discretion will be found "where the sentence is 'greatly at variance with the spirit and

purpose of the law, or manifestly disproportionate to the nature of the offense.' "  *People v.*

*Alexander*, 239 Ill. 2d 205, 212, 940 N.E.2d 1062, 1066 (2010) (quoting *People v. Stacey*, 193 Ill. 2d 203, 210, 737 N.E.2d 626, 629 (2000)).

¶ 52        In this case, defendant was found guilty of criminal sexual assault, a Class 1 felony.  See 720 ILCS 5/11-1.20(a)(3) (West 2014).  A person convicted of a Class 1 felony, other than second degree murder, is subject to a sentencing range of 4 to 15 years in prison.  730 ILCS 5/5-4.5-30(a) (West 2014).  When a sentence falls within the statutory range of sentences possible for a particular offense, it is presumed reasonable.  *Etherton*, 2017 IL App (5th) 140427, ¶ 30.  In order to consider it an abuse of discretion, we must find it to be at odds with the purpose and spirit of the law or manifestly disproportionate to the nature of the offense.  *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 33, 993 N.E.2d 614.  A defendant's rehabilitative potential and other mitigating factors are not entitled to greater weight than the seriousness of the offense.  When mitigating factors are presented to a court, the reviewing court should presume that the trial court considered them.  *People v. Pippen*, 324 Ill. App. 3d 649, 652, 756 N.E.2d 474, 477 (2001).  As the trial court's 15-year sentence falls within the relevant sentencing range, we will not disturb the sentence absent an abuse of discretion.

¶ 53        At the sentencing hearing, the trial court stated it considered the presentence report, its addendum, the statutory factors in aggravation and mitigation, defendant's sex offender evaluation, history, character, and attitude, the evidence and arguments of counsel, and defendant's statement in allocution.  The court recognized defendant's lack of criminal history and delinquent behavior but acknowledged the "serious harm to the victim" and the need to impose a sentence serious enough "to deter others from committing such an offense."

¶ 54        The seriousness of the crime is the most important factor for the trial court to consider.  *People v. Busse*, 2016 IL App (1st) 142941, ¶ 28, 69 N.E.3d 425.  The offense

committed by defendant consisted of the vaginal and oral penetration of a 13-year-old girl. Evidence elicited at trial described how defendant used his position as C.B.'s father to sexually assault her on multiple occasions. The court also heard from the victim and her mother about how defendant's actions have negatively and continuously affected the victim and her family. The record leaves no doubt the court considered the seriousness of defendant's actions.

¶ 55 Defendant, however, argues his 15-year sentence is excessive after considering his rehabilitative potential. Defendant asserts the trial court imposed a sentence that "does not account for that potential or otherwise include a rehabilitative aim." However, defendant's rehabilitative potential and other mitigating factors are not entitled to greater weight than the seriousness of the offense. *Pippen*, 324 Ill. App. 3d at 652.

¶ 56 Here, the record reflects the trial court weighed the mitigating factors, including defendant's rehabilitative potential, and the seriousness of the offense before sentencing defendant within the statutory sentencing range. The fact that defendant did not like the outcome after the court considered all the evidence before it does not warrant a reduction of defendant's sentence or another hearing. Defendant's sentence was within the statutory range of possible sentences and there is nothing in the record to support the assertion that the court's decision was fanciful, arbitrary, unreasonable, or manifestly disproportionate to the nature of the offense.

¶ 57 Accordingly, we find the 15-year sentence imposed by the trial court not " 'greatly at variance with the spirit and purpose of the law,' " nor " 'manifestly disproportionate to the nature of the offense.' " *Alexander*, 239 Ill. 2d at 212 (quoting *Stacey*, 193 Ill. 2d at 210). Thus, the court did not abuse its discretion.

¶ 58                                  III. CONCLUSION

¶ 59          For the reasons stated, we affirm the trial court's judgment.

¶ 60   Affirmed.