NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210107-U

NO. 4-21-0107

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 17, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Morgan County |
| GLEN E. SNYDER JR., | ) | No. 16CF1 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Christopher E. Reif, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Knecht and Justice Steigmann concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court affirmed the trial court's summary dismissal of defendant's postconviction petition, concluding defendant failed to set forth the gist of a constitutional claim that he was denied the effective assistance of counsel.

¶ 2   In June 2017, a jury found defendant, Glen E. Snyder Jr., guilty of one count of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2014)). The trial court sentenced defendant to 15 years' imprisonment. In August 2020, defendant filed a *pro se* postconviction petition, alleging (1) he was prevented from "telling needed knowledge to the jury" and (2) defense counsel failed to impeach the victim "on certain inconsistencies." The court dismissed defendant's postconviction petition at the first stage, finding it frivolous and patently without merit.

¶ 3        Defendant filed a late notice of appeal, which this court allowed. On appeal, defendant argues the trial court erred by summarily dismissing his *pro se* postconviction petition where defendant made an arguable claim of ineffective assistance of counsel. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        In January 2016, the State charged defendant by information with one count of criminal sexual assault (720 ILCS 11-1.20(a)(3) (West 2014)), alleging defendant committed an act of sexual penetration with C.B., who was under the age of 18, and defendant was a family member of the victim.

¶ 6                                    A. Jury Trial

¶ 7        In June 2017, the matter proceeded to a jury trial.

¶ 8                                    1. *C.B.*

¶ 9        C.B., born in 2001 and 16 years old at the time of trial, testified defendant was her father and, at the time of trial, she lived in Missouri with her mother, S.B. In late 2014, C.B. and her mother moved into defendant's residence in Jacksonville, Illinois, along with defendant's wife and their three children. C.B. indicated she and her mother slept on a "blow-up bed in the middle of the living room" and that she and defendant initially had a "dad-and-daughter relationship."

¶ 10        C.B. testified to four incidents which took place in defendant's residence. C.B. said the first incident took place in defendant's bedroom where she and defendant were watching a movie. C.B. testified they were both clothed and she began "dry-humping" defendant after he said something, although she could not recall "exactly what he said." The incident lasted approximately five minutes. C.B. testified she did not tell anyone about the incident because defendant threatened to "kick [her] and [S.B.] out of the house."

¶ 11        A second incident occurred a "couple weeks" later when C.B. and defendant were sitting on the couch watching television. C.B. testified defendant threw a blanket over them and started touching her vagina underneath her clothing. Defendant then took C.B. to the bedroom, put on a condom, placed a towel on the bed, and put his penis in her vagina.

¶ 12        C.B. testified a third incident occurred in defendant's bedroom. According to C.B., defendant "put a towel on the bed. He pulled down his pants and [her] pants, and then he put his penis in [her]." Defendant told C.B. to "give him a blow job," and C.B. complied.

¶ 13        C.B. described a fourth incident when she was washing her face in the bathroom. Defendant told C.B. he needed to use the restroom. C.B. testified defendant "pulled down his pants and lifted up [her] dress and put [her] in his lap" while he was sitting on the toilet. C.B. testified defendant's penis was "going up [her]" and defendant "took [her] hips and moved [her] up and down."

¶ 14        In June 2015, C.B. and her mother moved out of the house after C.B. "threw a big fit" and "punched a hole in the wall." Three months after moving out, C.B. told her mother about the sexual assaults because she was "really depressed" and the incidents were "on [her] mind like every single day."

¶ 15                           *2. Kyle Chumley*

¶ 16        Detective Kyle Chumley testified he was a member of the investigative division of the Jacksonville Police Department. In October 2015, Chumley received information from the Missouri Department of Social Services (Missouri DSS) that C.B. had made allegations of sexual assault against defendant. In December 2015, Missouri DSS provided Chumley with a DVD of an interview of C.B., conducted by a Missouri child advocacy center. After watching the interview, Chumley and another investigator went to defendant's residence to "speak with him

about the incident." Chumley conducted an interview of defendant at the police department, which was played for the jury.

¶ 17        During the interview with Chumley, defendant acknowledged "something inappropriate happened" with C.B. "one time," but defendant then stated he "could count the shower to [*sic*]." Defendant described an incident where he went to take a shower. C.B. told defendant she needed to take a shower as well. Defendant "hopped in" the shower, and C.B. "hopped in with [him]." According to defendant, C.B.'s "excuse" for getting in was because his other daughters got to do things with him, so he "just brushed it off" and "let it slide." Defendant stated he "looked at her" when she got in, "turned around," and "kept [his] back to her." Defendant told C.B., "[L]et's get this done I'm outta of here." Defendant indicated afterwards he felt "edgy" around C.B.

¶ 18        Defendant claimed another incident happened after he stayed awake for two days playing video games. Defendant indicated he went to bed after the children left for school. The next thing defendant remembered was "[f]eeling stuff." Defendant explained it felt like "someone fiddling down below" in his "[g]enital area." Defendant stated he was "so tired" that it was "pretty easy" to fall back asleep. Defendant again "woke up to another sense or feeling" and knew the feeling to be sex. Defendant claimed he woke up to see C.B. and that C.B. was "on top" of him. Defendant indicated C.B.'s "knees were like forward" towards him and remembered pushing her off after realizing she was "not [his] wife." Defendant recalled saying, "what the f*** are you doing" and C.B. putting on her shorts. After putting on his jeans, defendant stated he "dragged her out by her hair." Defendant admitted knowing it was child abuse, but he "dragged her out anyway." Later that evening, S.B. came back from work. Defendant stated S.B. "just heard [them] fighting, and she walked right outside. She didn't want no part of it."

Defendant told S.B. to "get your a*** in here" and admitted being "cruel to her." According to defendant, C.B. disclosed being raped before he had a moment to speak with S.B. Defendant recalled S.B.'s reaction as "shocked at first" and asking her to come to his bedroom "and talk." After walking into his bedroom, defendant stated C.B. "was hitting everything" and "hit a hole" in his wall.

¶ 19 After telling S.B. "exactly what happened," defendant explained S.B. put her hands by her face and started shaking. Defendant stated his wife came home later "that night" but he and S.B. agreed "not to tell her right off the bat." Defendant told his wife "a couple days later" that "things happened" between him and C.B. Defendant indicated he never called the police but admitted he "should have."

¶ 20 Sometime later, defendant and C.B. got into another fight due to defendant "not letting her ride her bike." Defendant kicked S.B. and C.B. out "that day." Defendant stated he continued talking to S.B. "almost every day" on Facebook until the communication abruptly ended. Defendant did not contact C.B. after their last fight.

¶ 21 Defendant recalled another incident wherein C.B. laid her head on his lap and asserted there was "no flesh on flesh." The last incident defendant recalled occurred while he was "fixing the lawn mower" and C.B. was "fixing the grill" in the backyard. After finishing their projects, defendant gave C.B. a hug, but the hug was "longer" and C.B. "pushed her body" against him. Defendant also claimed C.B. gave him a "little kiss." Defendant recalled he "kinda turned away" and C.B. tried to kiss him again. Defendant indicated he "didn't make a big deal out of that" because he knew C.B. and S.B. would be "gone soon."

¶ 22        At the conclusion of the interview, defendant stated, "I already know how this looks" and that he was "screwed" given C.B.'s allegations against him and S.B. being her mother.

¶ 23        On cross-examination, Chumley testified he never personally interviewed C.B., S.B., or defendant's wife. Chumley noted he attempted to speak with defendant's wife, but she was "very aggressive" towards him. When asked why he never interviewed C.B. or her mother, Chumley stated that the Jacksonville Police Department has "a protocol that is set up to where the law enforcement officials do not speak to children victims of this nature" and indicated both were interviewed in Missouri by "the equivalent of who we would use as a, a forensic interviewer."

¶ 24                                                3. *S.B.*

¶ 25        S.B. testified she had known defendant for over 20 years and had a daughter with him, C.B. S.B. contacted defendant in the spring of 2014 because she "felt that he needed to know his daughter." S.B. decided to move in with defendant and his family because she "needed a change" and defendant "asked [her] to consider it." Regarding the living arrangement, S.B. stated, "At first [things were] good." S.B. testified that she and C.B. lived with defendant for about 10 months, but they moved out "[d]ue to [C.B.] throwing a fit." S.B. did not know at the time what the fit was about.

¶ 26        According to S.B., neither defendant, defendant's wife, nor C.B. alerted her to any inappropriate sexual contact between defendant and C.B. while living in Jacksonville. Three months after moving to Missouri, C.B. began "getting distant." S.B. testified C.B. then disclosed the abuse. During cross-examination, S.B. reiterated never having a conversation with defendant after coming home from work about any inappropriate incident with C.B.

4. *Defendant*

¶ 28        Defendant testified on his own behalf and reiterated much of what he said in his interview with Chumley. Defendant learned about C.B. being his daughter during a Facebook conversation with S.B. Initially, defendant invited the pair to visit so he could "get to know [C.B.]" and "catch up on old times" with S.B. After discussing it with his wife, defendant invited S.B. and C.B. to move in, noting his wife's initial reaction to the arrangement "was ehhhhh" but after defendant "gave the puppy eyes," she agreed to "try it."

¶ 29        On the day of "the big incident," defendant stated he "had an abscess" in his "lower right jaw" and "was taking pills and all that" to deal with the pain. Defendant testified he stayed awake for "[t]wo to three days" playing video games to keep his mind off the pain. Defendant finally "couldn't handle it anymore" and "had to get some sleep." After putting two children to bed, defendant "walked back into the living room" where C.B. and his other daughter "were playing Minecraft." Defendant "watched them for maybe two to five minutes" and "told them goodnight." Defendant recalled going to bed at "nine-thirty at night."

¶ 30        Defendant stated he woke up because he "still felt pain" in his abscess and remembered "being fiddled with down below." Defendant further explained, "Well, once I figured I'm being fiddled with, I thought it was my wife. I told her stop, *** I'm not feeling good." Defendant then "turned to the wall" and fell back asleep. Defendant woke again feeling "[a] little more pain," specifically in his penis "like it was bent, like bent wrong." Defendant remembered "[k]inda just waking up a little bit" and recalled the bedroom being "pitch black" and touching a woman's knees that "didn't feel right." Defendant opened the bedroom curtain to let in "a little bit of light" and discovered C.B. on top of him "staying still." Defendant "bent [his] legs in, and [he] kicked her," stating, "I kicked her pretty hard." Defendant specifically

recalled the time being approximately 1:35 a.m. because he "noticed the clock *** on the computer desk" while buttoning his jeans.

¶ 31            At "around five" in the morning, S.B. arrived home from work. Defendant, having returned to his bedroom, "heard the door open" and "turned off the computer like real quick." Defendant claimed C.B. "spouted out 'Dad raped me. He raped me' " and S.B. immediately "put her coffee mug on a coffee table *** and she walked right back out." Defendant "opened the door" and told S.B., "[N]o, you're going to get the hell up here, we're going to go talk." According to defendant, he and S.B. discussed "[e]verything" in his bedroom and claimed their next course of action was "[t]o try to fix [C.B.]" and to show her "the right way."

¶ 32            During cross-examination, defendant admitted never attempting to get C.B. into counseling. Defendant asserted he was "[t]eaching her the right pathway to be honorful [*sic*]." Defendant never attempted to call the Department of Children and Family Services or the police. Defendant recalled his wife demanding S.B. and C.B. move out "plenty of times" after eventually disclosing everything and stated, "I kept telling her that I promised [S.B.] that we'd try and fix [C.B.]"

¶ 33                             5. *Closing Argument*

¶ 34            In his closing argument, defense counsel emphasized multiple inconsistencies in the testimony of S.B., C.B., and defendant. Defense counsel attributed the inconsistencies to C.B. lying. Defense counsel further characterized C.B.'s testimony as vague and not credible.

¶ 35            Following closing arguments, the jury found defendant guilty of criminal sexual assault, and the trial court set the matter for sentencing.

¶ 36                             B. Presentence Investigation

¶ 37     The Morgan County circuit court's probation and court services department prepared a presentence investigation report (PSI). Attached to the PSI was a police report prepared by Detective Chumley. In his report, Chumley noted his receipt of "the DVD of the CAC interview." Chumley viewed the DVD and documented his observations of C.B. speaking with an interviewer, as follows:

> "The interviewer asked [C.B.] if she knew why she was here and she stated that her Dad raped her. [C.B.] was referring to [defendant] as her father. [C.B.] stated that [defendant's] penis was inserted into her vagina on three occasions and his penis was inside her mouth on several other occasions while staying with [defendant] in Jacksonville. [C.B.] stated the events occurred when she was 13 and 14 years old.
>
> [C.B.] stated that the first time she had vaginal sex with [defendant] was on his bed. [C.B.] advised she was watching a movie and [defendant] came in and started kissing her. [C.B.] stated that [defendant] laid a towel on the bed and slammed her down and inserted his penis in her vagina. [C.B.] stated in the middle of sex he placed his penis in her mouth. [C.B.] stated that [defendant] had his pants around his ankles and that he wore a condom. [C.B.] advised that [defendant] ejaculated in the condom and it was white and watery and that he showed it to her.
>
> [C.B.] stated that the second time she had vaginal sex with [defendant] was again on his bed. [C.B.] advised that she started out giving [defendant] a blow job and then vaginal sex, followed up by a blow job. [C.B.] stated that [defendant] again wore a condom but never ejaculated in her mouth. [C.B.]

described [defendant] [as] having hair near his penis and that it tasted salty when his penis was in her mouth.

[C.B.] advised that the third time it occurred was in the bathroom. [C.B.] stated she was using the bathroom and [defendant] came in. [C.B.] advised that [defendant] sat on the toilet and made her sit on his penis. [C.B.] stated that [defendant] took his penis out of her vagina and it squirted and he wiped his penis off on toilet paper. [C.B.] advised that [defendant] then put his penis back in her vagina. [C.B.] stated that it hurt when [defendant's] penis was in her vagina and that she told him to stop. [C.B.] stated that [defendant] told her not to tell her mother, [S.B.] ***. [C.B.] advised that [defendant] stated he would kick her and her mother out of the house if she told."

¶ 38                                   C. Sentencing

¶ 39        In August 2017, the trial court sentenced defendant to 15 years' imprisonment. Defendant filed a motion to reconsider his sentence, which the trial court denied. Defendant appealed.

¶ 40                                   D. Direct Appeal

¶ 41        On direct appeal, defendant argued (1) he was denied the effective assistance of trial counsel and (2) his sentence was excessive. See *People v. Snyder*, 2020 IL App (4th) 180134-U, ¶ 3. Specifically, defendant argued he was denied the effective assistance of counsel where his counsel failed to impeach C.B. with prior inconsistent statements made during her interview with the Missouri child advocacy center. *Snyder*, 2020 IL App (4th) 180134-U, ¶ 41. Defendant pointed to Chumley's report summarizing the interview as proof of C.B.'s prior inconsistent statements. *Snyder*, 2020 IL App (4th) 180134-U, ¶ 41.

¶ 42        This court affirmed defendant's conviction and sentence but concluded the record did not contain sufficient information to resolve defendant's claim he was denied effective assistance of trial counsel. *Snyder*, 2020 IL App (4th) 180134-U, ¶ 43. Therefore, we declined to consider the claim. *Snyder*, 2020 IL App (4th) 180134-U, ¶ 46.

¶ 43                              E. Postconviction Petition

¶ 44        In August 2020, defendant filed a *pro se* petition for postconviction relief. Defendant made two claims: (1) "Laws prevented me from telling needed knowledge to the jury, that's what are [*sic*] lawyer told the wife and I" and (2) "Lawyer failed to impeach [C.B.] on certain inconsistencies." Defendant attached a notarized five-page letter in support of his petition. In the letter, defendant detailed "knowledge we have" regarding C.B. that defendant claimed he was unable to present at trial. Defendant presented "a whole different side of [C.B.] and what she is capable of," suggesting C.B. was mentally unstable and violent. Defendant admitted an encounter in which C.B. "hopped in the shower with me." Defendant further detailed an encounter where 13-year-old C.B. raped defendant while he slept. Defendant did not deny sexual conduct between he and C.B. but characterized C.B. as the aggressor, stating "the true rapist and criminal [was] free." Defendant did not reference C.B.'s interview with the Missouri child advocacy center or Detective Chumley's police report detailing the interview and did not assert inconsistencies between C.B.'s interview and her trial testimony.

¶ 45        The trial court dismissed defendant's postconviction petition as frivolous and patently without merit, having no arguable basis in law or in fact. The court explained, "The Court has reviewed the Post conviction Petition in its entirety. The Court would note that the petition does not attach affidavits or state why the same are not attached. The defendant's arguments are an attempt to re-litigate his innocence."

¶ 46        This appeal followed.

¶ 47                                II. ANALYSIS

¶ 48        On appeal, defendant argues the trial court erred by summarily dismissing his

*pro se* postconviction petition where defendant made an arguable claim of ineffective assistance

of counsel. Defendant argues he was denied effective assistance because his counsel failed to

impeach C.B.'s testimony with Detective Chumley's report of statements C.B. made in her

interview with the Missouri child advocacy center.

¶ 49        The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018))

"provides a mechanism for criminal defendants to challenge their convictions or sentences based

on a substantial violation of their rights under the federal or state constitutions." *People v.*

*Morris*, 236 Ill. 2d 345, 354, 925 N.E.2d 1069, 1075 (2010). A proceeding under the Act is a

collateral proceeding and not an appeal from the defendant's conviction and sentence. *People v.*

*English*, 2013 IL 112890, ¶ 21, 987 N.E.2d 371. The defendant must show he suffered

substantial deprivation of his federal or state constitutional rights. *People v. Caballero*, 228 Ill.

2d 79, 83, 885 N.E.2d 1044, 1046 (2008).

¶ 50        The Act establishes a three-stage process for adjudicating a postconviction

petition. *English*, 2013 IL 112890, ¶ 23. Here, defendant's petition was dismissed at the first

stage. At the first stage, the trial court must review the postconviction petition and determine

whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West

2018). This is an independent assessment of the substantive merit of the petition. *People v.*

*Harris*, 224 Ill. 2d 115, 126, 862 N.E.2d 960, 967 (2007). Our supreme court has held "a *pro se*

petition seeking postconviction relief under the Act for a denial of constitutional rights may be

summarily dismissed as frivolous or patently without merit only if the petition has no arguable

- 12 -

basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 11-12, 912 N.E.2d 1204, 1209 (2009). A petition lacks an arguable legal basis when it is based on an indisputably meritless legal theory, such as one that is completely contradicted by the record. *Hodges*, 234 Ill. 2d at 16. A petition lacks an arguable factual basis when it is based on a fanciful factual allegation, such as one that is clearly baseless, fantastic, or delusional. *Hodges*, 234 Ill. 2d at 16-17.

¶ 51    At the first stage, the allegations in the petition, when taken as true and liberally construed, must present the gist of a constitutional claim. *People v. Hatter*, 2021 IL 125981, ¶ 24, 183 N.E.3d 136. "Thus, to survive summary dismissal, a petitioner is only required to include a limited amount of detail and need not present formal legal arguments or citations to legal authority." *Hatter*, 2021 IL 125981, ¶ 24. "A *pro se* petitioner is not excused, however, from providing any factual detail at all surrounding the alleged constitutional violation." *Hatter*, 2021 IL 125981, ¶ 24. Our review of the first-stage dismissal of a postconviction petition is *de novo*. *People v. Dunlap*, 2011 IL App (4th) 100595, ¶ 20, 963 N.E.2d 394.

¶ 52    "In considering a petition pursuant to [section 122-2.1 of the Act], the [trial] court may examine the court file of the proceeding in which the petitioner was convicted, any action taken by an appellate court in such proceeding[,] and any transcripts of such proceeding." 725 ILCS 5/122-2.1(c) (West 2018). The petition must be both (1) verified by affidavit and (2) supported by "affidavits, records, or other evidence supporting its allegations," or, if not available, the petition must explain why. 725 ILCS 5/122-2 (West 2018); *People v. Collins*, 202 Ill. 2d 59, 65, 782 N.E.2d 195, 198 (2002). Generally, noncompliance with section 122-2 "is 'fatal' to a post-conviction petition [citation] and by itself justifies the petition's summary dismissal [citations]." (Internal quotation marks omitted.) *Collins*, 202 Ill. 2d at 66.

¶ 53        A defendant's claim of ineffective assistance of counsel is analyzed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Cathey*, 2012 IL 111746, ¶ 23, 965 N.E.2d 1109. To prevail on such a claim, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496, 931 N.E.2d 1198, 1203 (2010). To establish deficient performance, the defendant must show his attorney's performance fell below an objective standard of reasonableness. *People v. Evans*, 209 Ill. 2d 194, 219, 808 N.E.2d 939, 953 (2004) (citing *Strickland*, 466 U.S. at 687-88). A defendant must satisfy both prongs of the Strickland standard, and the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Clendenin*, 238 Ill. 2d 302, 317-18, 939 N.E.2d 310, 319 (2010).

¶ 54        Here, defendant argues his petition established the gist of a constitutional claim of ineffective assistance of trial counsel. In his petition, defendant alleged his "[l]awyer failed to impeach [C.B.] on certain inconsistencies."

¶ 55        Even reading defendant's postconviction petition as broadly as possible, it is woefully insufficient to present the gist of a constitutional claim of ineffective assistance. Defendant does not specify in his petition what "inconsistencies" trial counsel should have used to impeach C.B.'s testimony. Although "the [trial] court *may* examine the court file of the proceeding in which the petitioner was convicted, any action taken by an appellate court in such proceeding[,] and any transcripts of such proceeding," (emphasis added) (725 ILCS 5/122-2.1(c) (West 2018)), it is not required to scour the record for a constitutional violation that fits defendant's generalized claim. See *People v. Delton*, 227 Ill. 2d 247, 258, 882 N.E.2d 516, 522 (2008) (finding "a broad conclusory allegation of ineffective assistance of counsel" was "not allowed under the Act"). Defendant's allegation in his postconviction petition completely lacked

any detail and thus was insufficient to show both arguable deficient performance and prejudice because, even at the first stage of proceedings, broad conclusory allegations of ineffective assistance of counsel are insufficient under the Act. *Delton*, 227 Ill. 2d at 258.

¶ 56　　　　Moreover, as noted above, the Act requires that the petition include "affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2018). The failure to comply with this obligation is "fatal and by itself justifies the petition's summary dismissal." *Harris*, 224 Ill. 2d at 126.

¶ 57　　　　Here, defendant attached a five-page letter to his petition in which he detailed "knowledge we have" regarding C.B. that defendant claimed he was unable to present at trial. Defendant reaffirmed he had engaged with C.B. inappropriately but maintained C.B. was the aggressor, and thus, he was innocent of any misconduct. Even if we accept defendant's notarized letter as an affidavit in substance, it provided no detail as to defendant's claim of ineffective assistance of counsel. Defendant made no reference to C.B.'s interview with the Missouri child advocacy center or Detective Chumley's account of the interview contained in his police report. Defendant did not assert a single inconsistency between the report of C.B.'s interview and her trial testimony. Defendant therefore did not attach a supporting affidavit to his petition, nor does he explain the absence of any documents that could have corroborated his allegations or allege he was unable to obtain them.

¶ 58　　　　Defendant contends on appeal that the only affidavit he could have obtained to support his claim of ineffective assistance of counsel would have been an affidavit from his trial counsel, and therefore his failure to attach a supporting affidavit should be excused. Defendant cites *People v. Hall*, 217 Ill. 2d 324, 333, 841 N.E.2d 913, 919 (2005), for the proposition that when a defendant raises a claim of ineffective assistance of counsel, the "[f]ailure to attach

- 15 -

independent corroborating documentation or explain its absence may *** be excused where the petition contains facts sufficient to infer that the only affidavit the defendant could have furnished, other than his own sworn statement, was that of his attorney." In *Hall*, the defendant appealed the circuit court's dismissal of his postconviction petition at the second stage of the proceedings, and the State challenged the sufficiency of the petition on appeal. *Hall*, 217 Ill. 2d at 331. The defendant had attached to his postconviction petition, "the transcript of the guilty plea hearing, a copy of the charging instrument, and [defendant's] affidavit setting forth in detail the alleged misrepresentations of his attorney." *Hall*, 217 Ill. 2d 332-33. Given the defendant's allegations arose from conversations at which only the defendant and his attorney were present, the supreme court noted the only other affidavit the defendant could have furnished was that of his attorney and such an affidavit would be difficult or impossible to obtain. *Hall*, 217 Ill. 2d at 333.

¶ 59        Defendant's case is more similar to *People v. Collins*, 202 Ill. 2d 59, 782 N.E.2d 195 (2002), which the supreme court distinguished in *Hall*. *Hall*, 217 Ill. 2d at 332-33. In *Collins*, the defendant attached only a sworn affidavit to his postconviction petition alleging ineffective assistance of trial counsel and did not attach any other supporting documentation. *Collins*, 202 Ill. 2d at 62. The circuit court summarily dismissed defendant's petition at the first stage. *Collins*, 202 Ill. 2d at 62. On review, the supreme court found the defendant did not comply with the requirements of section 122-2 because his petition was not supported by documentation and did not explain the absence of such documentation. *Collins*, 202 Ill. 2d at 66. The supreme court further found the defendant's failure to comply with section 122-2 justified the summary dismissal of his postconviction petition. *Collins*, 202 Ill. 2d at 66. The supreme court noted "section 122-2 makes clear the petitioner who is unable to obtain the necessary

'affidavits, records, or other evidence' must at least explain why such evidence is unobtainable." *Collins*, 202 Ill. 2d at 68.

¶ 60 Defendant's situation here is more similar to that in *Collins* than *Hall*. He is appealing the dismissal of his petition at the first stage of proceedings and submitted only a five-page signed statement that provided no information on his ineffective assistance of counsel claim. Defendant's petition, as discussed, contained a single sentence claiming counsel "failed to impeach [C.B.] on certain inconsistencies." Besides his failure to allege any facts substantiating his conclusory allegation, like *Collins*, defendant failed to explain why such supporting documentation was unavailable.

¶ 61 On direct appeal, this court found "defendant's [ineffective assistance] claim better suited to postconviction proceedings, where defendant is permitted to supplement the record with the necessary supporting evidence to substantiate his claim." *Snyder*, 2020 IL App (4th) 180134-U, ¶ 46. Defendant has not taken even the most minimal steps to supplement the record or explain what evidence in or outside of the record might support his broad, conclusory claim. Although counsel on appeal attempts to detail each minor inconsistency between C.B.'s trial testimony and the police report summarizing her interview with the Missouri child advocacy center, this does not cure the deficiencies in defendant's petition. Defendant's petition does not present even the gist of a constitutional claim. See *Hodges*, 234 Ill. 2d at 9. Thus, we find the trial court's first stage dismissal of defendant's *pro se* postconviction petition was proper.

¶ 62                                         III. CONCLUSION

¶ 63 For the reasons stated, we affirm the trial court's dismissal of defendant's postconviction petition at the first stage.

¶ 64 Affirmed.